964 F.2d 980
 Walter Stephen JACKSON, by his parents and next friends,
Walter and Helen Jackson, Steve Nunez, by his guardian and
next friend, Mary Kathryn Reed, Ron Fuller, by his mother
and next friend, Josephine Boughton, Mildred Tsosie, by her
next friend, Polly Arango, Mary Katherine Nowak, by her next
friend, James W. Ellis, Esq., Lillian Willmon, by her next
friend, Arthur Grumblatt, Andra Martinez, by her next
friend, Paula Duvall, Clinton and Shawn Heath, by their
mother and next friend, Belva Heath, Richard Stanfield, by
his father and next friend, The Reverend Clyde Stanfield,
Joseph Gonzales, by his mother and next friend, Charlotte
Gonzales, Sean McHenry, by his next friend, Robert
Desiderio, Esq., Alfred Shirley, by his next friend,
Frederick Hart, Esq., James Fritche, by his next friend,
Sally Dehon, Betty Young, by her next friend, Mary Dudley,
Ph.D., Roseann Crockett, by her next friend, Robert McNeill,
Esq., Andre Armenta, by his mother and next friend Loretta
Armenta, Kelli Van Curen, by her parents and next friends,
Ted and Sallie Van Curen, Lacey Walker, by her mother and
next friend, Sandra Walker, Kim Lautenschlager, by her
mother and next friend, Dale Lautenschlager, and William
Thomas, by his parents and next friends, James and Elizabeth
Thomas, Virgil Addison, Roberto Atilano, Felicia Botello,
Joseph Baca, Melinda Conway, Daniel Garcia, Viola Gurule,
Thomas Harkins, Robert Hynes, Damon Keeswood, Sharon Koons,
Garry Martinez, Jose Martinez, Robert McHenry, Marcelino
Moya, Ted Nichols, Margaret Romero, Loriann Strickland, Beth
Thomas, Albert Vasquez, Edwin Vasquez, Benito Arguello,
Benjamin Romero, on behalf of themselves and all others
similarly situated, and Supporters of Developmentally
Disabled New Mexicans, Inc., on behalf of its members,
Plaintiffs-Appellees,
v.
FORT STANTON HOSPITAL AND TRAINING SCHOOL, Los Lunas,
Hospital and Training School, New Mexico Health and
Environment Department, Larry Gordon, individually and in
his official capacity as Secretary of the New Mexico Health
and Environment Department, Carolyn Klintworth, individually
and in her official capacity as Acting Administrator, Los
Lunas Hospital and Training School, Ervin Aldaz,
individually and in his official capacity as Administrator,
Fort Stanton Hospital and Training School, New Mexico Human
Services Department, Lou Gallegos, individually and in his
official capacity as Secretary of the New Mexico Human
Services Department, New Mexico Department of Education, New
Mexico Board of Education, Catherine Smith, Lynn Medlin,
Rudy Castellano, John W. Bassett, L. Grady Mayfield, Herman
Wisenteiner, Maria Chavez, Melvin Martinez, David McMann,
Millie Pogna, Gerald Thomas, Emmalou Rodriguez, J. James
Sanchez, Virginia Trujillo and Gordon King, individually and
in their official capacities as members of the New Mexico
Board of Education, Alan Morgan, individually and in his
official capacity as the New Mexico Superintendent of Public
Instruction, Elie Gutierrez, individually and in his
official capacity as Director of Special Education for the
State of New Mexico, Los Lunas Public Schools, Los Lunas
Board of Education, Richard Lovato, Dottie Silver, Ismael
Gurule, Laurel C. Edenburn and Anthony Apodaca, individually
and in their official capacities as members of the Los Lunas
Board of Education, Capitan Public Schools, Capitan Board of
Education, James McDaniel, Thomas Trost, Preston Stone,
Hollis Fuchs and Kenneth Cox, individually and in their
official capacities as members of the Capitan Board of
Education, Defendants-Appellees,
and
John E. Young and Iris Young, legal guardians and parents of
Rita Kay Young; Dora L. and Araristo Romero, legal
guardians and parents of Roy Romero; Marion Livingston,
legal guardian of Willie King; Albino V. Tarasci, legal
guardian and parent of Benjamin Tarasci; Theresa M. Allen,
legal guardian of Joann Iller; Carolyn A. Neeper, legal
guardian and parent of Monte S. Neeper; Robert L. and
Margaret L. Stryker, legal guardians and parents of Patricia
K. Stryker; Madeline V. Martinez, legal guardian of Eduardo
Valerio; Louisa Hensley, legal guardian and parent of Paul
Ray Hensley, Jr.; Malone Peterson, legal guardian of Donald
Eugene Peterson; Lavada Philpott, legal guardian and parent
of Charles Gordon Philpott; Mary L. McIntyre, legal
guardian and parent of Cliff L. Blackwell; William and
Oneta Dye, legal guardians and parents of Rodney Dye;
Glenda F. Miries, legal guardian of Sybil Jetton; Andrew E.
and Marianne Martinez, parents of Andra Marie Martinez;
Fidel Lopez and Grace Lopez, legal guardians and parents of
Joann Therese Lopez; Victor Jiron, legal guardian and
parent of Angeina Jiron; Willard C. and Ima Copper, legal
guardians and parents of Calvin Ray Cooper; Manuela and
Angel B. Alverado, legal guardians and parents of Theresa
Alverado; Lisa Bonney, legal guardian and parent of Joseph
A. Cordova; Christine Garcia, legal guardian and parent of
Susan Garcia; Charlie T. and Juanita P. Jones, legal
guardians and parents of Nada Ann Jones; Palmeria Vigil,
legal guardian of Marie Pamela Vigil; George H. and Ruth
Graham, legal guardians of Cynthia Gayle Graham; Marian F.
Henricks, legal guardian of Glenn Henricks; Tiodora Madrid,
parent of Raul Madrid; Herman L. Tapley, legal guardian of
Benny Tapley; Juanita J. Montoya, legal guardian and parent
of Diana K. Montoya; Mr. and Mrs. Tommy Trujillo, legal
guardians of Linda Trujillo; Dolores L. Gonzales, legal
guardian of Mary Lou Lucero; Theodore Jiron, brother of
Darion Jiron; Robert and Maureen Dawney, parents of
Christopher A. Downey; Mary M. Schneider, legal guardian of
Bryan G. Schneider; Benito Pacheco, legal guardian of
Richard Anthony Pacheco; Trancito J. Candelaria, legal
guardian of Ramon Candelaria; Tomasista and Ramon Aragon,
parents of Carmela Maldonado; Thomas J. Thompson, legal
guardian of Fidel Thompson; Phillip N. Dodd and Judy E.
Dodd, parents of Angela C. Dodd; Mary Ann Terrazas, parent,
and Theresa Ann Gallegos, legal guardian, of Mark A.
Terrazas; Kenneth A. Barnes, legal guardian of Kenneth J.
Barnes; Frank C. and Delfa Matta, parents of Frank Matta,
Jr.; Lupita S. Garcia, legal guardian of Norma Jean Garcia;
Bernaidita Gutierrez, legal guardian and parent of Patsy
Gutierrez; Dorothy Ohmart, legal guardian and parent of
Victor Ohmart; Billie O'Bryan Finley, legal guardian of
Alice Ruth O'Bryan; Rosa M. Lopez, parent of Rosa Delores
Bernardo; Ethel L. Lowe and Clara Lindstrom, legal
guardians of Dennis Ray Lowe; Henry and June L. Bryant,
legal guardians and parents of Henry Lynn Bryant; Diega
Olivarez, legal guardian of Louis Olivarez; William W.
Hoffman, legal guardian of Ellen Kathryn Hoffman; Irene
Senutovitch, legal guardian of Christine Senutovitch;
Robert and Susan Horning, legal guardians of Lisa Horning;
Ladonna Powell, legal guardian of April Powell; Patrick L.
and Sarah F. Murphy, legal guardians of Daniel E. Murphy;
Dora T. Sena, legal guardian of Antonia Sena; Thomas F.
Sullivan, Jr., legal guardian of Sheila Mary Sullivan; Lupe
Martinez, parent of Ignacita; Orcelia Romero, parent of
Benjamin Chavez Romero; Al Farinelli, brother of Nick
Farinelli; Mary R. Michiels, legal guardian of Camille
Tena; Jack L. and Louise Kite, parents of Jackie Kite;
Antonia Segura, parent of Ruby Martinez; Kenneth A. and
Mildred L. Barnes, legal guardians of Joey Barnes; Sylvia
and Kay Sensanbugher, legal guardians of Rex Sensanbaugher;
Doris J. Harrison, legal guardian of Dale Harrison;
Marianne K. Newton, legal guardian of David William Kern;
Santiago and Annie Gutierrez, legal guardians of Jose S.
Gutierrez; Floyd and Dorothy Hobbs, parents of Denise
Hobbs; Manuel and Maria Longoria, parents of Maria
deRosario and Cruz Alberto; Homer L. Hailey, parent and
legal guardian of Charles Ray Hailey; Mary L. Russell,
legal guardian of and parent of Neva Russell; Harry
Thompson, Jr., legal guardian of Rodger Marc Thomason;
Andreita Cordero, legal guardian of Maria R. Cordero;
Cornelia A. Mendenhall, legal guardian of Barry Thomas
Mendenahall; Allan K. and Ruby W. Buttke, parents of Linda
Kay Buttke; Max W. and Mary Ann Sanchez, legal guardians
and conservators of James Howard Sanchez; Jack and Mabel
Sherwood, legal guardians and parents of Leroy Sherwood;
Arlene E. Stanley, legal guardian and parent of Linda Jo
Staley; Flora Sandoval, legal guardian and parent of Ralph
Sandoval; Wilber F. Offtermatt, legal guardian of Edward G.
Offtermatt; Cassius C. Martin, legal guardian of Sandra Sue
Martin; David H. Nez, legal guardian of Barbara Nez; Wayne
H. and Elizabeth L. Trump, legal guardians and parents of
David Wayne Trump; Carmel Sanchez Norris, legal guardian
and parent of Counsuelo C. Sanchez; Gilbert and Margaritta
L. Aragon, legal guardians of John Schevei Kart; Patrick F.
Jewell, legal guardian of Kathleen M. Jewell; Alice Coslin,
legal guardian of JoAnn Roper; Nicholas and Juana Reyes,
parents of Araceli Reyes; W.P. Shunkey, legal guardian of
David L. Shunkey; Majorie Clingeupeil, legal guardian of
Cynthia Ann Clingepeil; Dominga Martinez, legal guardian of
Dora Ramirez; Thomas W. and Jane E. Newton, legal guardians
of Henry S. Newton; James R. and Laverne Newcomer, parents
of Lynette Newcomer; Raymond R. and Mayre Binyon, parents
of Donna F. Binyon; Victor Jiron, legal guardian of
Angelina Jiron; Josephine Rutar, legal guardian of Celeste
Rutar; Paula M. Trujillo, legal guardian of Beverly Jean
Heck; Dora L. Romero, legal guardian and parent of Ray
Daniel Romero; Hoyt C. and Annise Mae Evans, parents of
Sharon Kay Evans; Rosenda Bravo, legal guardian of Anthony
Marquez; Joe L. and Lillian B. Lente, legal guardians and
parents of Joanne Sue Lente; Andres and Valeria Salas,
parents of Anthony Salas; Charles E. Woodhouse, legal
guardian and parent of Ann Marie Woodhouse; Kenneth D. and
Thelma E. Osborne, legal guardians and parents of Warren J.
Osborne; Ola Mae Tidwell, legal guardian of Doyle Wayne
Tidwell; Majorie F. Miller, legal guardian and parent of
Leslie Eugene Miller; Greg A. Abeyta and Sylvia B. Abeyta,
legal guardians of Michael Abeyta; Mary Ava Peet, legal
guardian of Robert Todd Sherman; A.R. and Dora H. Serna,
parents of Sandra Serna; Jim A. and Sandy S. Ehler, parents
of Clinton Ehler; Henry and Rosita A. Sena, parents of H.
Anthony Sena, Jr.; John P. Cosaus, legal guardian of Johnny
Ray and Fabian Cosaus; Rore Marquez and Augustina Montoya,
legal guardians of Ernesto Hurbina; I.L. Zaleski, parent of
Melody Zaleski; Julian and Marie E. Lovato, legal guardians
of Shirley Lovato; Freddie F. and Annie Segura, legal
guardians of Christella Segura; Mary A. Gonzales, legal
guardian of Issac Apodaca; Carmen C. Garcia, legal guardian
of Manuel Garcia; Gus and Pilar Gandora, parents of Gregory
James Gandara; Elsie M. Mead, legal guardian of Charles L.
Franklin; Margaret G. Weitzel, legal guardian of Joe
Raymond Gallegos; Isabel H. Ruiz, legal guardian of Alberto
David Ruiz; Brenda Grogan, parent of Michael W. Grogan,
Intervenors-Appellants.
 No. 91-2027.
 United States Court of Appeals,
Tenth Circuit.
 May 18, 1992.
 
 Kent Winchester (Roberta Beyer and Vernon W. Salvador, of Albuquerque, N.M., with him on the brief), for the intervenors-appellants.
 Robert Tabor Booms (Tom Udall, Atty. Gen. of N.M., and Nancy Alma Taylor, Asst. Atty. Gen. of N.M., were with him on the brief), Asst. Atty. Gen. of N.M., for the defendants-appellees.
 Frank J. Laski (Philip B. Davis, of Albuquerque, N.M.; Peter Cubra, of the Protection & Advocacy System, of Albuquerque, N.M.; and Judith A. Gran, of the Public Interest Law Center of Philadelphia, Philadelphia, Pa., were with him on the brief), of the Public Interest Law Center of Philadelphia, Philadelphia, Pa., for plaintiffs-appellees.
 Before LOGAN and TACHA, Circuit Judges, and COOK, District Judge.*
 TACHA, Circuit Judge.
 
 
 1
 Intervenors appeal from a district court order that requires the parties to submit a plan to correct deficiencies at Fort Stanton Hospital and Training School (FSH & TS) and Los Lunas Hospital and Training School (LLH & TS), requires defendants to prepare a plan of transfer to a community setting for each resident of FSH & TS and LLH & TS whose interdisciplinary treatment team (IDT) recommends or has recommended transfer, and permanently enjoins defendants from permitting the IDTs to take into account the availability of community facilities when making a recommendation as to whether a resident should be transferred to a community setting. Jackson v. Fort Stanton Hosp. & Training Sch., 757 F.Supp. 1243 (D.N.M.1990). On appeal, intervenors contend that the district court erred in holding that section 504 of the Rehabilitation Act of 1973 and the Due Process Clause of the Fourteenth Amendment require that defendants transfer residents whose IDTs recommend community placement. They also contend that the court erred in holding that the Due Process Clause forbids the IDTs from considering the availability of community settings when making placement recommendations. We exercise jurisdiction under 28 U.S.C. § 1292(a)(1) over only the portion of the district court's order that issues permanent injunctive relief, and we reverse.
 
 BACKGROUND
 
 2
 In July 1987, twenty-one developmentally disabled individuals brought this civil rights class action suit on behalf of themselves and others similarly situated to challenge the institutionalization of developmentally disabled persons at FSH & TS and LLH & TS, both of which are operated by the State of New Mexico. In their complaint, plaintiffs sought to correct the constitutional and statutory deficiencies of the conditions at FSH & TS and LLH & TS. In addition, plaintiffs sought relief allowing developmentally disabled persons at FSH & TS and LLH & TS to live in integrated, family-like settings within the community. Thirteen of the original twenty-one named plaintiffs acted as representatives of the class.
 
 
 3
 In June 1988, the district court allowed more than 125 parents and guardians of residents at FSH & TS and LLH & TS to intervene. Seeking to bring the conditions at the institutions into compliance with constitutional and statutory mandates, intervenors filed a complaint in intervention. Intervenors also opposed plaintiffs' efforts to require mandatory transfer of the institutions' residents to community-based facilities.
 
 
 4
 On May 23, 1989, the district court certified a class of all persons who at that time resided at FSH & TS or LLH & TS, all persons who would become residents of the institutions during the pendency of the action, and all persons who had been transferred from these two institutions to other facilities funded by defendants. The court also divided the class into two subclasses pursuant to Fed.R.Civ.P. 23(c)(4)(B). The thirteen named representatives of the original plaintiffs represented a subclass that sought both closure of FSH & TS and LLH & TS and community placement of the residents. Intervenors comprised the other subclass seeking to improve the conditions at the institutions, but opposing mandatory transfers of the institutions' residents.
 
 
 5
 After an eight-week trial, at which evidence was presented as to the original thirteen plaintiffs and as to conditions at the institutions, the district court entered an extensive Memorandum Order and Opinion on December 28, 1990. The court made detailed findings of fact regarding almost every aspect of the conditions at FSH & TS and LLH & TS. It found that the conditions at the institutions were statutorily and constitutionally deficient in many ways. Accordingly, the court ordered the parties to confer and to submit to the court a plan for correcting the institutions' deficiencies.[1]
 
 
 6
 In its December 28, 1990 order, the district court also made various findings of fact with respect to defendants' implementation of the IDTs' recommendations that certain residents be placed in community settings. The court held that defendants' manner of implementing--and in many cases failure to implement--these community-placement recommendations violated both the residents' rights under section 504 of the Rehabilitation Act of 1973 and also their substantive due process rights guaranteed by the Fourteenth Amendment of the Constitution. The court's holding divides into three separate parts. First, the district court held that defendants discriminated against residents with severe handicaps in violation of section 504 by excluding them "from qualitatively different facilities which are being provided to their less severely handicapped peers, despite IDT determinations that particular severely handicapped residents can live in community settings if defendants make reasonable accommodations in those settings." Second, the court held that the defendants violated the residents' substantive due process rights because they failed to implement recommendations by IDTs--consisting of qualified professionals--that certain of these residents should be placed in community settings. Third, the court held that defendants violated residents' substantive due process rights by considering the present availability of community services when determining whether to recommend the residents for community placement.
 
 
 7
 The district court fashioned two forms of relief based on its findings and legal conclusions regarding defendants' community placement processes. First, the court permanently enjoined defendants "from permitting IDTs to take into account the availability or lack of availability of community services in reaching a recommendation as to whether a resident should be served in the community." The second form of relief granted by the district court involved the process of making and carrying out community placement recommendations. The court ordered defendants, by March 1, 1991, to "prepare a written plan of transfer to an appropriate community setting for each resident whose IDT has recommended placement in a community setting." The district court encouraged plaintiffs and intervenors, after receiving defendants' plans, to confer with defendants immediately "in a good faith effort to resolve their concerns" and to amend the plans accordingly. The court also afforded plaintiffs and intervenors the opportunity to "file with the court and serve on defendants a statement of any remaining objections they may have to, and their proposals for amending, any particular plan."
 
 
 8
 With respect to residents whose IDTs had made recommendations against community placement based on the unavailability of adequate community services, the court ordered defendants--by April 1, 1991--to "convene IDT meetings to reconsider and to make recommendations about community placement that do not take into account the present availability or unavailability of community services." The court ordered defendants--by no later than June 10, 1991--to prepare transfer plans for those residents whose IDTs, upon reconsideration, make new recommendations for community placement. The court provided plaintiffs and intervenors the same opportunity to participate in and object to these transfer plans.[2]
 
 
 9
 Defendants did not appeal from the district court's Memorandum Order and Opinion of December 28, 1990, but instead elected to attempt to comply with the planning and corrections process ordered by the district court. Defendants generally contend that the issues ruled on by the district court are not yet ripe for appeal. Intervenors, on the other hand, filed a notice of appeal from the December 28, 1990 order and contend that the district court erred with respect to its holding that section 504 of the Rehabilitation Act and the Due Process Clause of the Fourteenth Amendment require transfer of certain residents at FSH & TS and LLH & TS. They also contend that the court erred by enjoining defendants from considering the present availability of community facilities when deciding whether to recommend a resident for community placement. Therefore, on this appeal, we are faced with the rather unusual situation in which defendants have not appealed from an order granting the relief requested by plaintiffs; instead, intervenors, who also sought certain relief granted by the district court, appeal from a portion of the relief granted against defendants.
 
 DISCUSSION
 I. Appellate Jurisdiction
 
 10
 As an initial matter, we must determine whether we have jurisdiction to decide the issues on appeal. McGeorge v. Continental Airlines, Inc., 871 F.2d 952, 953 (10th Cir.1989) (an appellate court has a duty to inquire into its own jurisdiction). It is clear that we have jurisdiction to review the portion of the district court order that permanently enjoins defendants from allowing the IDTs to consider the availability of community settings when making placement recommendations. Under 28 U.S.C. § 1292(a)(1), we "have jurisdiction of appeals from ... [i]nterlocutory orders of the district courts of the United States ... granting ... injunctions." However, we must still determine whether we have jurisdiction over the remainder of the issues on appeal. We first address both whether the remainder of the order itself is a final order (appealable under § 1291) and also whether the portions of the order requiring the submission of remedial plans are tantamount to an injunction (appealable under § 1292(a)(1)). Because we hold that the order is not final and that the portions of the order requiring the submission of plans are not tantamount to an injunction, we also must determine whether the otherwise nonappealable issues raised by appellants fall within our jurisdiction as issues related to the permanent injunction issued by the district court.
 
 
 11
 A. Appealability of Issues Other Than the District Court's Explicit Permanent Injunction
 
 
 12
 In their brief on appeal, intervenors state that our jurisdiction is based on 28 U.S.C. § 1291. Section 1291 vests appellate court jurisdiction only "from final decisions of the district courts" (emphasis added). In this circuit, we have not yet directly addressed whether, and under what circumstances, a district court order requiring parties to submit a remedial plan is a final order. Most circuits conclude that remedial plan orders generally do not constitute final orders appealable under § 1291. See Balla v. Idaho State Bd. of Corrections, 869 F.2d 461, 464-65 (9th Cir.1989); Sherpell v. Humnoke Sch. Dist. No. 5, 814 F.2d 538, 539-40 (8th Cir.1987); Groseclose v. Dutton, 788 F.2d 356, 358-61 (6th Cir.1986); Liddell v. Board of Educ., 693 F.2d 721 (8th Cir.1981); Spates v. Manson, 619 F.2d 204, 208-11 (2d Cir.1980); Hoots v. Pennsylvania, 587 F.2d 1340, 1346-47 (3d Cir.1978); Reed v. Rhodes, 549 F.2d 1050 (6th Cir.1976) (relying on Bradley v. Milliken, 468 F.2d 902, 902-03 (6th Cir.), cert. denied, 409 U.S. 844, 93 S.Ct. 45, 34 L.Ed.2d 83 (1972), cert. denied, 414 U.S. 1038, 94 S.Ct. 538, 38 L.Ed.2d 329 (1973)); Taylor v. Board of Educ., 288 F.2d 600, 601-02 (2d Cir.), aff'd 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961). In addition, most circuits hold that a district court's order to submit a remedial plan is not tantamount to an injunction appealable pursuant to § 1292(a)(1). Newsom v. Norris, 888 F.2d 371, 379-80 (6th Cir.1989); Hendrickson v. Griggs, 856 F.2d 1041, 1043-44 (8th Cir.1988); Sherpell, 814 F.2d at 539-40; Groseclose, 788 F.2d at 359-61; Hoots, 587 F.2d at 1348-51; Bradley, 468 F.2d at 902-03; Taylor, 288 F.2d at 604-05.
 
 
 13
 Several circuits, however, recognize exceptions to the general rule that district court orders that require the preparation and submission of remedial plans are not appealable. One obvious exception to the general rule occurs when the district court order for a plan clearly contains injunctive relief; such relief is appealable under § 1292(a)(1). See, e.g., Hendrickson, 856 F.2d at 1044. As noted above, because the district court permanently enjoined defendants from allowing IDTs to consider available services when making community placement decisions, that portion of the order is appealable under § 1292(a)(1).
 
 
 14
 Several courts also recognize an exception to the general rule of nonappealability when the district court's "order specifie[s] the nature, requirements and extent of the relief to be afforded by the plan to be submitted." Hoots, 587 F.2d at 1349 (holding that the nature and content of an order requiring a plan for school desegregation was not sufficiently specific to make the order appealable as an injunction); see also Spates, 619 F.2d at 209-10 (order requiring prison officials to file plan for improved legal assistance to inmates not sufficiently specific to be appealable); Groseclose, 788 F.2d at 360-61 (order requiring prison to submit plan for improved conditions of confinement not sufficiently specific as to content of the plan); cf. United States v. Alabama, 828 F.2d 1532, 1537-38 (11th Cir.1987) (order requiring plan of desegregation in institutes of higher learning was appealable where district court had "already 'substantially prescribed' the remedial plan"), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). In Hoots, the Third Circuit explained the rationale underlying this exception:
 
 
 15
 In a case in which the district court has, in its order, determined the nature and extent of the injunctive relief which the final decree will grant, all that remains for the parties is to propose the mechanics for the implementation of that relief. The issues in such a case are ready for appellate consideration, because the precise plan which ultimately will be adopted by the district court will do no more than determine how the injunctive relief will be accomplished as contrasted with the nature and extent of that relief. Therefore, any actions that may thereafter be taken by the district court will not change or affect the legal issues raised by the appeal.
 
 
 16
 Hoots, 587 F.2d at 1352. The general rule--that orders requiring a plan are not appealable--and its recognized exceptions are consistent with the policy underlying rules of finality that, where possible, appellate courts should avoid interfering with trial court proceedings until the trial court receives a full opportunity to develop the record, resolve disputed issues, and grant an appropriate remedy. See 15A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3907, at 274-78 (1991).
 
 
 17
 Based on these principles, we conclude that the portions of the district court's order of December 28, 1990 requiring that defendants submit plans both for the correction of deficiencies at FSH & TS and LLH & TS and also for the transfer of residents whose IDTs recommend community placement are not independently appealable. Naturally, the district court's order is not completely devoid of specifics. However, the court did not outline in detail the nature and content of these plans. Instead, the court determined that the constitutional and statutory rights of residents at the two institutions had been violated and gave substantial latitude to the parties to determine, acting together in good faith, the most appropriate method to remedy those violations. For example, in the portion of its order that addressed plaintiffs' claims under section 504 of the Rehabilitation Act of 1973, the district court held that "where reasonable accommodations in community programs can be made, defendants' failure to integrate severely handicapped residents into community programs which presently serve less severely handicapped residents violates § 504." The district court did not specifically describe either the nature of accommodations that should be made or how defendants should comply with section 504. Instead, the court allowed defendants, with input from plaintiffs and intervenors, significant discretion to prepare and implement a plan to make these reasonable accommodations.
 
 
 18
 Since the December 28, 1990 order, defendants have interacted with the court, with plaintiffs, and with intervenors to create and begin implementation of a plan for overarching systemic changes at FSH & TS and LLH & TS. Although this interaction has been less than ideal, the record indicates that significant progress has been made in the planning process. The plan's evolution during the many months since the district court's order further underscores that the order did not rigidly impose the nature and content of a plan for remedying constitutional and statutory violations at the two institutions.[3]
 
 
 19
 B. Discretionary Jurisdiction Over Issues Related to the Injunction
 
 
 20
 Although we conclude that--except for that part of the district court's order that grants a permanent injunction--issues addressed in the December 28, 1990 order are otherwise nonappealable, jurisdiction may still arise in two situations. First, we "have jurisdiction to consider those matters which are closely related to the grant ... of the injunction." Colorado v. Idarado Min. Co., 916 F.2d 1486, 1491 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991). Second, "[w]e also have discretionary jurisdiction to consider 'rulings that are related but not essential to the validity of the injunction.' " Id. (quoting Asset Allocation & Management Co. v. Western Employers Ins. Co., 892 F.2d 566, 569 (7th Cir.1989) and citing Tri-State Generation & Transmission, Ass'n Inc. v. Shoshone River Power, Inc., 874 F.2d 1346, 1352-53 (10th Cir.1989)). In deciding whether to exercise such discretionary jurisdiction, the following factors inform our decision:
 
 
 21
 (1) whether the otherwise nonappealable issue is sufficiently developed, both factually and legally, for our review, (2) whether review of the appealable issue involves consideration of factors closely related or relevant to the otherwise nonappealable issue, and (3) whether judicial economy will be better served by resolving the otherwise nonappealable issue, notwithstanding the federal policy against piecemeal appeals.
 
 
 22
 Id. Our discretion to hear issues otherwise not appealable should be exercised "cautiously." Tri-State, 874 F.2d at 1352.
 
 
 23
 Initially, we conclude that the otherwise nonappealable issues were not "a basis for," Tri-State, 874 F.2d at 1352, or "closely related to," Idarado Mining Co., 916 F.2d at 1491, the district court's decision to enjoin defendants from permitting IDTs to consider what community settings are available when they make community placement recommendations. In their appellate brief, intervenors raise two issues that are otherwise nonappealable: first, whether defendants discriminated against severely handicapped residents under section 504 by not transferring them to community facilities; and second, whether defendants violated residents' substantive due process rights by not transferring them after their IDTs recommended community placement. Both of these issues deal with administrative decisions that are made after the IDTs recommend placement. Thus, neither of these two issues directly relates to recommendations made by the qualified professionals that make up the IDTs, and jurisdiction is not appropriate under Idarado's "closely related" test.
 
 
 24
 We also conclude that we should not exercise our discretion at this time to address these otherwise nonappealable issues. A district court remedy that involves a plan inherently remains subject to a changing or evolving record. The Federal Rules of Civil Procedure explicitly give courts authority to modify their interlocutory orders, see Fed.R.Civ.P. 54(b); Balla, 869 F.2d at 465, so that even the order itself remains subject to change. Because the court allowed each of the parties to provide substantial input into creation of the plans, the parties may strike an accord that addresses each party's interests and obviates the need for an appeal. Further, in the more than one year that has passed since the district court entered its order, the parties and the court appear to have postponed their efforts related to community placement efforts, and instead have worked to develop and implement a plan to correct constitutional and statutory violations related to the conditions at FSH & TS and LLH & TS. Based on our review of the record, we have every reason to believe that the court and the parties will undertake the same type of coordinated developmental process in the area of community placement recommendations and transfers. For these reasons, we conclude that our discretion is best exercised by allowing the district court to further "resolve[ ] the remedial issue[s] consistent with" the statutory and constitutional violations it has identified at the two institutions. Idarado Min. Co., 916 F.2d at 1492.
 
 
 25
 II. The Permanent Injunction Issued by the District Court
 
 
 26
 The district court ordered that "[d]efendants are hereby enjoined from permitting IDTs to take into account the availability or lack of availability of community services in reaching a recommendation as to whether a resident should be served in the community." The following excerpt from the district court's order explains the legal reasoning underlying the injunction:
 
 
 27
 Professional judgment must be based on what is appropriate, not upon what resources are available.... Institutional confinement which results from an absence of appropriate alternatives is not based on professional judgment.
 
 
 28
 Many residents of LLH & TS and FSH & TS are not recommended for community placement because of the unavailability of proper community services for those residents.... The residents are entitled to treatment recommended by qualified professionals whose judgment is unsullied by consideration of the fact that the state does not provide funding for appropriate service in community settings.
 
 
 29
 Although the district court did not clearly specify the constitutional or statutory grounds for its determination that the IDTs cannot consider the availability of community resources when they make community placement decisions, this excerpt of the opinion was located within the section entitled, "B. Constitutional Claims--1. Substantive Due Process." Therefore, we assume that the district court based its legal reasoning--and the injunctive relief that followed from that reasoning--on the Due Process Clause of the Fourteenth Amendment.[4]
 
 
 30
 In Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court determined that the substantive aspect of the Fourteenth Amendment's Due Process Clause imposes two types of obligations on states with respect to the care and training they provide to disabled persons who are institutionalized or wholly dependent on the state. First, the Due Process Clause imposes on the states a duty to provide safe living conditions, freedom from bodily restraint, and minimally adequate training. Id. at 315-22, 102 S.Ct. at 2457-61 (citing Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), as establishing the right to safe conditions and Greenholtz v. Inmates of Neb. Penal & Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), as recognizing the right to freedom from bodily restraint). The Court provided specific instructions for courts to follow in evaluating whether these constitutional minimums are met with respect to adequate training. In determining whether the state meets these minimal training obligations, the court "must show deference to the judgment exercised by a qualified professional" unless the decision made by the professionals "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. 457 U.S. at 322-23, 102 S.Ct. at 2462.
 
 
 31
 Second, Youngberg established that the state must ensure professional judgment is in fact exercised in making care and training decisions:
 
 
 32
 We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraint. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised."
 
 
 33
 Id. at 321, 102 S.Ct. at 2461 (quoting Romeo v. Youngberg, 644 F.2d 147, 178 (3d Cir.1980) (Seitz, C.J., concurring)); see also Society for Good Will to Retarded Children, Inc. v. Cuomo, 902 F.2d 1085, 1089 (2d Cir.1990) ("the issue is not whether the optimal course of treatment as determined by some experts was being followed, but whether ' "professional judgment in fact was exercised" ' "); Lelsz v. Kavanagh, 807 F.2d 1243, 1250 (5th Cir.) ("we may rule only on whether a decision to keep residents at SDC [Suffolk Developmental Center] is a rational decision based on professional judgment"), cert. dismissed, 483 U.S. 1057, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987).
 
 
 34
 In the portion of the district court's opinion that supports the injunctive relief issued, the court's analysis clearly focuses on the second substantive due process obligation imposed on the state by Youngberg--the obligation to ensure the exercise of professional judgment in making care and training decisions. We conclude that the mere fact that the IDTs consider the availability or unavailability of community services when they make care and training recommendations does not, alone, support a conclusion that the IDTs--and thus the state--fail to exercise reasonable judgment.
 
 
 35
 In Youngberg, the Court concluded that "the State is under a duty to provide respondent with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." Youngberg, 457 U.S. at 324, 102 S.Ct. at 2462 (emphasis added). A reasonable consideration must necessarily incorporate a cost analysis. A professional determination that excludes all considerations of costs and available resources could easily become impossible for a state to implement within justifiable budgetary limitations. A professional determination that includes an analysis of cost is reasonable and does not constitute "such a substantial departure from accepted professional judgment ... to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323, 102 S.Ct. at 2462. Thus, as the Fourth Circuit explained, "qualified professionals, to whom the courts owe deference, may consider the burden on the state when they prescribe treatment." Thomas S. v. Morrow, 781 F.2d 367, 375 (4th Cir.) (citation omitted), cert. denied, 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673, cert. denied, 479 U.S. 869, 107 S.Ct. 235, 93 L.Ed.2d 161 (1986).
 
 
 36
 We recognize that, by imposing overly extensive cost restrictions in individual cases, the state could so limit the range of recommendations available to professionals that their judgment would be rendered inadequate to meet constitutional standards. In such a case, the court might have to enter an order that would implicate appropriations decisions. The injunction in this case, however, in effect forbids the state from placing cost limitations on one specific treatment alternative--community placement. The injunction is tantamount to a holding that such a restriction renders professional judgment inadequate in all individual cases. Community placement is only one of various possible ways in which the state may comply with its constitutional obligations to adequately care for and train involuntarily committed individuals. Consideration by the IDTs of the limited availability of community services does not mean that the IDTs fail to exercise professional judgment with respect to other alternatives by which the state may satisfactorily meet its constitutional obligations. Therefore, we hold that the district court erred in ruling that the Due Process Clause of the Fourteenth Amendment requires that defendants be enjoined from permitting IDTs to consider the availability of community services when making treatment decisions.
 
 
 37
 The role of the federal courts in this important area is a limited one: to make sure that the state and the qualified professionals that the state enlists to assist in the exercise of professional judgment meet the constitutional threshold of protection granted to disabled persons by the Due Process Clause. Above that constitutional threshold may exist many constitutionally acceptable alternatives from which the state may legitimately choose. Inevitably, some of these alternatives may take into account the availability of treatment options or indeed the resources necessary to supply some of these options.
 
 
 38
 When the district court ordered by injunction that the IDTs could not consider available alternatives, the court went too far--it exceeded its appropriate constitutional role. Youngberg inserts the federal courts into these treatment and placement decisions only to ensure the state's compliance with the minimum standards required by the federal Constitution. The choice of alternatives within the universe of constitutionally acceptable choices is to be left to the states and their "qualified professionals." Nowhere are the federal courts empowered to say that states may not consider available resources or facilities. When a court does so, it thrusts itself into the unconstitutional role of making decisions that are reserved to the states under the Constitution and, worse, into the role of driving state resource allocation beyond those resources necessary to meet minimum constitutional standards.
 
 
 39
 The appropriateness of the district court's permanent injunction is a discrete question separable from the other issues on appeal. Our resolution of this question will shape the development of community placement plans ordered by the district court. Having reviewed the record, including the progress made by the district court and the parties since the district court issued its order, we are confident that our decision today will aid--without unduly infringing upon--the process of arriving at an appropriate remedial plan for compliance with constitutional and statutory standards. Accordingly, we REVERSE in part and REMAND for proceedings consistent with this opinion.
 
 
 
 *
 The Honorable H. Dale Cook, Senior District Judge for the United States District Court for the Northern District of Oklahoma, sitting by designation
 
 
 [1]
 Because the relief granted by the district court regarding the correction of these deficiencies has not been raised on appeal, we do not discuss in detail the nature of the deficiencies or why the district court held that the deficiencies violated the Constitution and applicable federal statutes. See Jackson v. Fort Stanton Hosp. & Training Sch., 757 F.Supp. 1243 (D.N.M.1990)
 
 
 [2]
 The district court also set deadlines for accomplishing the transfer of each resident to a community facility. The court stated that defendants should make transfers within 200 days after an IDT recommends the resident for placement or within 200 days after a transfer plan is completed. However, the district court later suspended the transfer plan deadlines contained in the December 28, 1990 order and stated that deadlines will be reset once the defendants complete their systemic interagency planning process. From our review of the record, it is apparent that most of the interaction between the parties and the court since the December 28, 1990 order has focused on efforts to create and implement a plan for correcting deficiencies at FSH & TS and LLH & TS
 
 
 [3]
 Our holding today does not conflict with our decision in Board of Educ. v. Dowell, 375 F.2d 158, cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967). In Dowell, the district court ordered the Oklahoma City Board of Education "to prepare and submit a plan [for racial desegregation] substantially identical to that set out" in a plan previously prepared by a court-appointed panel of experts. Id. at 164 (emphasis added). In that case, the district court's order clearly specified the exact nature and content of the plan and thus fell within the exception to the general rule of nonappealability now recognized by most circuits. See Spates, 619 F.2d at 210 (citing Dowell and recognizing that the order was appealable because the district court had outlined the nature and content of the ordered plan); Hoots, 587 F.2d at 1349 (jurisdiction in Dowell was predicated on "the crucial element ... that the order from which appeal was taken specified the overall content or outline of the plan to be submitted"). Because the district court's order in this case has left many of the specifics of the ordered plans to the discretion and negotiation of the parties, the order is very different--and easily distinguishable--from the very specific order in Dowell
 
 
 [4]
 The district court's reasoning also appears to be based on substantive due process principles because the court quoted and cited Clark v. Cohen, 613 F.Supp. 684, 704 & n. 13 (E.D.Pa.1985), aff'd 794 F.2d 79 (3d Cir.), cert. denied, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986), and Lelsz v. Kavanagh, 673 F.Supp. 828, 835 (N.D.Tex.1987). The portions of those cases cited by the court discuss a mentally retarded person's substantive due process right to "minimally adequate training" under Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)