2015 SEP 21 AM 9: 1_



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In re the Detention of:

C.L.,

              Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 72509-2-I

DIVISION ONE

UNPUBLISHED

FILED: <u>September 21, 2015</u>

Cox, J. – "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'"[1] C.L. appeals the order committing him to involuntary treatment, arguing that insufficient evidence supports the court's findings that he was "gravely disabled" and that treatment in a less restrictive setting was not in his best interest. Here, the State presented testimony demonstrating that C.L. could not provide for his essential needs of health or safety and could not adhere to treatment outside an inpatient psychiatric facility. Thus, substantial evidence supports the trial court's findings. And those findings support its conclusions of law. We affirm.

In July 2014, C.L. was admitted into a hospital after a less restrictive order had expired earlier that month. In August 2014, the State petitioned for C.L.'s initial detention, and he was detained. Thereafter, the State petitioned for 14 days of involuntary treatment, and the court entered an agreed order. Before the

---

[1] <u>In re Det. of A.S.</u>, 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting <u>Holland v. Boeing Co.</u>, 90 Wn.2d 384, 390, 583 P.2d 621 (1978)).

14 day period ended, the State petitioned for 90 days of more restrictive involuntary treatment. The petition alleged that C.L. was "gravely disabled" due to a mental disorder. At trial, the State presented testimony from mental health counselor Alexandra Hughes. Hughes testified to her interviews with C.L. and notes contained in his medical chart.

The court found that C.L. was gravely disabled and that treatment in a less restrictive setting was not in his best interest. The court entered an order committing C.L. for an additional 90 days. The court later entered supplemental findings of fact and conclusions of law.

C.L. appeals.

## SUFFICIENCY OF EVIDENCE

C.L. argues that insufficient evidence supports the court's findings. We disagree.

"[T]he State must prove its case by clear, cogent and convincing evidence" in order to commit a person to 90 days of involuntary treatment.[2] "[W]here the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment."[3] If the State's burden of proof is by "clear, cogent and convincing evidence, the evidence must be more substantial than in the ordinary civil case"

---

[2] In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986); accord RCW 71.05.310.

[3] LaBelle, 107 Wn.2d at 209.

where the burden of proof is "by a preponderance of the evidence."[4] The trial court's findings "must be supported by substantial evidence in light of the 'highly probable' test."[5] "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'"[6] "[W]e will not disturb the trial court's findings . . . if [it is] supported by substantial evidence which the . . . court could reasonably have found to be clear, cogent and convincing."[7]

Here, the State demonstrated that C.L. could not provide for his essential needs of health or safety and could not adhere to treatment outside an inpatient psychiatric facility. Thus, substantial evidence supported the trial court's findings.

### Gravely Disabled

C.L. first argues that insufficient evidence supports the court's finding that he was gravely disabled. We disagree.

A person can be committed for involuntary treatment if that person is gravely disabled.[8] Gravely disabled "means a condition in which a person, as a result of a mental disorder, . . . [i]s in danger of serious physical harm resulting

---

[4] Id.

[5] Id. (quoting In re Pawling, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)).

[6] A.S., 91 Wn. App. at 162 (quoting Holland, 90 Wn.2d at 390).

[7] LaBelle, 107 Wn.2d at 209.

[8] RCW 71.05.280(4).

from a failure to provide for his or her essential human needs of health or safety."[9]

The State must show "a substantial risk of danger of serious physical harm."[10] Specifically, "the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded."[11] This risk of harm does not have to be "evidenced by recent, overt acts."[12]

The State is not required to show that the "danger of serious harm" is imminent.[13] Requiring imminence "could result in the premature release of mentally ill patients who are still unable to provide for their essential health and safety needs outside the . . . hospital setting but who, because of their treatment there, are no longer in 'imminent' danger of serious physical harm."[14]

Further, "uncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital."[15] A person can be gravely disabled if evidence indicates that person's "deteriorated condition"

---

[9] RCW 71.05.020(17)(a).

[10] LaBelle, 107 Wn.2d at 204.

[11] Id. at 204-05.

[12] Id. at 204.

[13] Id. at 203.

[14] Id.

[15] Id. at 210.

renders him "unable to make a rational choice with respect to his ability to care for his essential needs."[16]

Here, Hughes testified that C.L. was gravely disabled due to his mental disorder. Specifically, she stated that C.L. had "fixed delusions, poor insight, poor impulse control, [and] inappropriate boundaries with others. He . . . [was] not able to maintain his activities of daily living independently."[17]

Hughes also read several notes from C.L.'s medical chart into the record. A psychiatric evaluation note described C.L.'s behavior after the less restrictive order expired. This note stated that C.L. stopped taking his medication, became increasingly aggressive towards other residents where he lived, and believed the FBI and CIA were looking for him. The note also stated that C.L. punched another resident and threatened other residents and staff.

Hughes also read into the record a note written at the end of the 14 day commitment period. This note stated that C.L. was "unable to carry out directions," made "paranoid statements," and was "aggressive and verbally abusive" towards other patients.[18] It also stated that C.L.'s appearance was "unkept," that his activities of daily living "need[ed] prompting," and that he was "not oriented to the situation."[19] The next day's note stated that C.L. was "still

---

[16] Id.

[17] Report of Proceedings (August 25, 2014) at 9.

[18] Id. at 14.

[19] Id.

positive for significant psychotic behavior."[20]

Importantly, Hughes stated that C.L. had not been organized enough to participate in his own discharge planning. She read another note into the record stating that C.L. did not have housing or an outpatient provider for his discharge and "will not survive at a shelter or on the street. He would probably end up in jail because he is not prepared for that much independence."[21] Hughes also stated that C.L. had not made any plan without "delusional content."[22]

Hughes further testified that she did not believe C.L. "could meet his basic needs for safety" if he were to leave the hospital because "he would not know where to go to get his basic needs met."[23] C.L.'s mother is his social security protective payee, and Hughes believed C.L.'s mother and family were not in Western Washington or Seattle. Hughes stated C.L. was homeless and she did not believe he knew how to access his money or housing by himself. She also did not believe C.L. could relocate to Wenatchee by himself to "access any sort of services."[24]

Hughes's testimony demonstrated a substantial risk of danger that C.L. was unable to provide for his essential needs of food, clothing, shelter, and medical treatment on his own because he continually expressed psychotic behavior and poor impulse control up to three days before trial. Thus, this

---

[20] Id. at 15.

[21] Id. at 17.

[22] Id. at 21.

[23] Id.

[24] Id.

testimony constitutes substantial evidence to support the trial court's finding that C.L. was gravely disabled.

C.L. argues that he was not gravely disabled. He does not contest that he has a mental condition. Rather, he cites two other reasons. They are unpersuasive.

C.L. first argues that he was not gravely disabled because his behavior in the hospital improved. The State satisfied its burden of proof because it was required only to show "a substantial *risk* of danger of serious physical harm."[25] Additionally, the State was not required to show that the "danger of serious harm" was imminent.[26] Although the testimony demonstrated that C.L. had generally been "medication-compliant" and his behavior improved *in* the hospital, the State showed a substantial risk of danger with evidence that C.L. would still be unable to provide for his essential needs *outside* the hospital.[27] Specifically, Hughes's testimony illustrated the aggressive and psychotic behavior that led to C.L.'s detainment after the less restrictive order expired.

Hughes also observed "current threatening behaviors" and had "little to no[]" confidence that C.L. knew where to obtain medication, food, or shelter.[28] More importantly, Hughes did not know if C.L. could continue his medication compliance "outside . . . an impatient setting" and noted the difference between

---

[25] LaBelle, 107 Wn.2d at 203-04 (emphasis added).

[26] Id. at 203.

[27] Report of Proceedings (August 25, 2014) at 26-31.

[28] Id. at 22, 25.

meeting one's basic needs in a structured inpatient setting versus being outside the hospital.[29]

Second, C.L. argues that the State's focus on his potential difficulty returning to Wenatchee or inability to access a shelter in Western Washington does not demonstrate that he was gravely disabled. He specifically argues that the State's claim that he "would be homeless if released" was insufficient to involuntarily detain him. This understates the full scope of the evidence.

C.L.'s psychotic behavior "rendered him unable to make a rational choice with respect to his ability to care for his essential needs."[30] The testimony showed that C.L. would not know where to go to access a shelter in Western Washington on his own. Similarly, C.L. did not know how to return to Wenatchee to access his money, housing, or services. This testimony constitutes substantial evidence of C.L.'s inability to provide for his essential needs. Being homeless if released was not the focus of the State's argument.

Additionally, C.L.'s argument is not supported by the case he cited. C.L. argues that "[i]nvoluntary commitment of an individual is a significant deprivation of liberty that may not be imposed simply because the State believes the individual will be better off in a hospital than on the street."[31] C.L. then cites In re Detention of Harris[32] to support his argument. But the issues in that case were

---

[29] Id. at 22, 35.

[30] LaBelle, 107 Wn.2d at 210.

[31] Brief of Appellant at 9.

[32] 98 Wn.2d 276, 278, 654 P.2d 109 (1982).

8

whether dangerousness could "serve as the basis for depriving an individual of his liberty" and whether "the summons procedures of RCW 71.05.150(1) violate[d] constitutional safeguards of procedural due process."[33] Thus, that case is not analogous to this case. Accordingly, C.L.'s argument is unpersuasive.

*Treatment in Less Restrictive Setting*

C.L. argues that insufficient evidence supports the trial court's finding that treatment in a less restrictive setting was not in his best interest. We disagree.

A person may be committed for 90 days of involuntary treatment if the State shows that "the best interests of the person or others will not be served by a less restrictive treatment which is an alternative to detention."[34] RCW 71.05 does not create a statutory right to less restrictive treatment.[35] Further, a person is not entitled to treatment in a less restrictive setting when continued treatment is "amply supported by professional judgment."[36] A court "'may take into account the availability of treatment options or . . . the resources necessary to supply . . . these options'" when determining if there are acceptable treatment alternatives.[37]

Here, the State presented substantial evidence that treatment in a less restrictive setting was not in C.L.'s best interest. Specifically, Hughes testified

---

[33] Harris, 98 Wn.2d at 280, 285.

[34] RCW 71.05.320(1); accord In re Det. of T.A.H.-L., 123 Wn. App. 172, 184, 97 P.3d 767 (2004).

[35] In re Det. of J.S., 124 Wn.2d 689, 701, 880 P.2d 976 (1994).

[36] Id.

[37] Id. at 700 (quoting Jackson v. Fort Stanton Hosp. & Training Sch., 964 F.2d 980, 992 (10th Cir. 1992)).

that C.L. could not survive in shelters, based on her review of C.L.'s progress notes and interactions with him. One progress note characterized C.L. as "agitated, threatening, [and] hyperverbal."[38] The note also described his thought process as "grandiose, tangential, [and] . . . delusional."[39] C.L.'s risk assessment that day was "[s]ignificant for psychotic behavior."[40]

Other notes stated that C.L. complained that he was in the hospital for the wrong reasons and continually presented "with poor insight."[41] The next day's note described C.L.'s thought process as delusional and his behavior as "anxious, isolative, and withdrawn."[42] The note also stated C.L. was "not oriented to place."[43]

Hughes further testified that C.L. "has shown . . . no insight into his current condition" and she recommended "inpatient psychiatric care."[44] C.L. would not "be able to adhere to treatment outside of an inpatient psychiatric facility" or have "the capability to care for himself outside of a structured residential setting."[45]

---

[38] Report of Proceedings (August 25, 2014) at 18.

[39] Id.

[40] Id.

[41] Id.

[42] Id. at 19.

[43] Id.

[44] Id. at 22-23.

[45] Id. at 23.

10

Hughes also noted that C.L.'s shouting of delusional statements in court demonstrated his "poor impulse control."[46]

Hughes's testimony showed that C.L. continually expressed psychotic behavior and had no insight into his mental disorder up to three days before trial. Most importantly, her testimony showed that C.L. would not be able to maintain treatment outside the hospital. Thus, the State presented substantial evidence to support the trial court's finding that treatment in a less restrictive setting was not in C.L.'s best interest.

C.L. argues that the trial court could not "find the State met its burden based only on a lack of available resources."[47] Specifically, C.L. argues that the court "improperly focused on the resources available" to him and that the State "could not meet its burden simply by suggesting no services were available" to him.[48] C.L. cites In re Detention of T.A.H.-L.[49] to support his argument that "the appropriate inquiry when considering a less restrictive option is not whether there is a specific resource available to the individual but instead whether the person presents a danger of serious physical harm in a less structured environment."[50] This argument is unpersuasive.

As previously stated, the court may determine if treatment is acceptable by looking at "'the availability of treatment options or . . . the resources necessary

---

[46] Id. at 35.

[47] Brief of Appellant at 12.

[48] Id. at 11-12.

[49] 123 Wn. App. 172, 187, 97 P.3d 767 (2004).

[50] Brief of Appellant at 10.

to supply . . . these options.'"[51] Here, the court acknowledged C.L.'s ability to live outside a hospital when he had access to "structured supportive housing" and "mental health services" in Wenatchee.[52] But the court's finding that treatment in a less restrictive setting "would not be appropriate" for C.L. was supported by evidence of C.L.'s inability to locate and obtain his essential needs on his own **and** the unavailability of structured housing and mental health services in Seattle.[53]

C.L. also cites In re Detention of J.S.[54] to support his argument that requiring him "to engage in the services on 'the other side of the mountains' or participate in comparable services in [W]estern Washington pursuant to a less restrictive order was appropriate regardless of whether the court was aware of a specific facility that would currently accept him."[55] This argument is unpersuasive.

C.L. is correct that the trial court's ability to order less restrictive treatment is not restricted when no such treatment is available.[56] Treatment in a less restrictive setting "can be ordered even when . . . no facility has agreed to

---

[51] J.S., 124 Wn.2d at 700 (quoting Jackson, 964 F.2d at 992).

[52] Clerk's Papers at 37.

[53] Id.

[54] 124 Wn.2d 689, 699, 880 P.2d 976 (1994).

[55] Brief of Appellant at 12.

[56] J.S., 124 Wn.2d at 698.

assume the responsibility."[57]  But as previously stated, RCW 71.05 does not create a statutory right to less restrictive treatment.[58]  Thus, the court is not required to "create a facility specifically designed for . . . [a person's] unique needs."[59]

In sum, C.L.'s arguments are unpersuasive.

We affirm the 90-day involuntary commitment order.

_Cox, J._

WE CONCUR:

_Trickey, J_     _Dwyer, J._

---

[57] In re Det. of R.A.W., 104 Wn. App. 215, 222, 15 P.3d 705 (2001).

[58] J.S., 124 Wn.2d at 701.

[59] T.A.H.-L., 123 Wn. App. at 187.