Tracy EASLEY, By her next friend,
Lucille EASLEY and Florence
Howard, Plaintiffs,

v.

Karen F. SNIDER, Secretary of the
Department of Public Welfare,
et al., Defendants.

Civ. A. No. 93–0221.

United States District Court,
E.D. Pennsylvania.

Dec. 20, 1993.

Susan J. Forney, Office of Atty. Gen., Harrisburg, PA, for defendants.

## OPINION

ANITA B. BRODY, District Judge.

In this action I must decide whether a state program that provides health maintenance and other ancillary services to physically disabled individuals can exclude from eligibility for those services physically disabled individuals who are not mentally alert as defined by the program. I find that this program violates the Americans with Disabilities Act by using an improper eligibility criterion to screen out disabled individuals who could benefit from the service.

### FACTS

I received evidence from both parties at a bench trial on October 12th to 13th, 1993. From that evidence I made the findings of fact that follow.

#### A. The Attendant Care Program

The Attendant Care Program (ACP) is administered by the Pennsylvania Department of Public Welfare (DPW) pursuant to the Attendant Care Services Act. 62 Pa. Stat.Ann. §§ 3051–55 (Supp.1993). The act became effective on July 1, 1987. *Id.* The statute commands the DPW to "establish and develop ... programs of attendant care services for eligible individuals." 62 Pa.Stat. Ann. § 3054.

"Attendant care services" are defined by the Act as "[t]hose basic and ancillary services which enable an eligible individual to live in his home and community rather than in an institution and to carry out functions of daily living, self-care and mobility." 62 Pa.Stat. Ann. § 3053. Included among the basic services are health maintenance activities, bathing and personal hygiene, dressing and grooming, and feeding. *Id.* Ancillary services include "homemaker-type" services, "companion-type" services, and "assistance with cognitive tasks, including, but not limited to, managing finances, planning activities and making decisions." *Id.*

Ilene W. Shane, Disabilities Law Project, Stephen F. Gold, Philadelphia, PA, for plaintiffs.

"Eligible individual" is defined as "[a]ny physically disabled/mentally alert person 18

through 59 years of age." *Id.* In addition to be eligible the individual must meet all of the following requirements:

(1) Experience any medically determinable physical impairment which can be expected to last for a continuous period of not less than 12 months.

(2) Is capable of selecting, supervising and, if needed, firing an attendant.

(3) Is capable of managing his own financial and legal affairs.

(4) Because of physical impairment, requires assistance to complete functions of daily living, self-care and mobility, including, but not limited to, those functions included in the definition of attendant care services.

*Id.*

The statute also contains five statements of policy, three of which are pertinent to the merits of this case.

(1) The increased availability of attendant care services for adults will enable them to live in their own homes and communities.

(2) Priority recipients of attendant care services under this act shall be those mentally alert but severely physically disabled who are in the greatest risk of being in an institutional setting.

(3) Recipients of attendant care have the right to make decisions about, direct the provision of and control their attendant care services. This includes, but is not limited to, hiring, training, managing, paying and firing of an attendant.

62 Pa.Stat.Ann. 3052.

The DPW administers the ACP in accord with the objectives and commands of the statute. 62 Pa.Stat.Ann. § 3054(a). Pursuant to the statutory guidelines, the DPW contracts with providers of attendant care services. Defendant's Direct Examination of Paula Jean Howley, Director of DPW Attendant Care Program, Transcript of Oct. 13, 1993 at 135–36. Those agencies chosen provide attendant care services in conformity with the statute and DPW regulations. *Id.*

The DPW has an ACP manual that largely adopts, and also fleshes out the terms of Attendant Care Act. Plaintiffs' Exhibit 1.

The manual lists the following as Program Goals for eligible individuals:

1. To live in the least restrictive environment as independently as possible;

2. To remain in their homes and to prevent their inappropriate institutionalization; and,

3. To seek and/or maintain employment.

*Id.* at 1.

The manual also directs contractors to "design and provide a program which [ensures that] [c]onsumers have the right to make decisions about, direct the provision of, and control their Attendant Care Service [including] hiring, training, managing, paying, and firing an attendant." *Id.* at 5.

In practice, the DPW carries out this mandate by offering three models of attendant care service management—the agency model, the consumer model and the combination model. *See* Plaintiffs' Direct Examination of Paula Jean Howley, DPW Attendant Care Program Manager, Trial Transcript of October 12, 1993 at 121. The method chosen is at the discretion of the consumer, and the level of mental alertness has no direct relationship to the method chosen. *Id.* at 125, 127–28.

In the consumer model, the consumer maintains complete control of the employment and management of the attendant. The consumer can advertise for an attendant, interview applicants, hire, train, supervise and, if necessary, fire the attendant. Defendants' Cross Examination of Paula Jean Howley, Tr. of October 12 at 143. The consumer manages all financial matters such as salary and taxes. *Id.*

Under the agency model, the attendant is the employee of an agency which hires, supervises and if necessary fires the attendant. Plaintiffs' Direct Examination of Al Condeluci, Executive Director of United Cerebral Palsy Assoc. of Pittsburgh District, Tr. of October 12 at 162. The agency pays the attendant and takes responsibility for taxes. Plaintiffs' Direct Examination of Paula Jean Howley, DPW Attendant Care Program Manager, Trial Transcript of October 12, 1993 at 124. Even under this model, the consumer often supervises the attendant to some extent in the home. Defendants' Cross

Examination of Paula Jean Howley, Tr. of October 12 at 143.

Under the combination model, the consumer reserves some management functions for herself, for example hiring and supervision, but delegates other functions to the agency, perhaps financial matters. *Id.* at 143.

The manual also delineates the priority consumers for the services when funding is limited. The manual provides that when service hours become available the waiting list should be addressed in the following order.

1. First Priority: Persons who are at greatest risk of institutionalization (that is, without Attendant Care Service there is a substantial likelihood that the applicant would need to enter a nursing home or other long-term care residential facility within three months)....

2. Second Priority: Persons currently residing in a nursing home or other long-term residential care facility who, except for the lack of Attendant Care Service, could leave the facility....

3. Third Priority: All other eligible persons who are served on a first-come, first serve basis.

ACP Manual, Plaintiffs' Exhibit 1 at 24.

### B. The Plaintiffs

#### 1. Tracy Easley

Tracy Easley is a twenty-nine year old woman who was physically disabled in a car accident in August 1982. Plaintiffs' Direct Examination of Lucille Easley, Mother of Tracy Easley, Tr. of Oct. 12 at 65. At the time of the accident she was eighteen years old, and entering her sophomore year at Vassar college after having graduated high school at the age of sixteen. *Id.* at 64. The accident rendered her unable to walk and limited her mobility in other respects. *Id.* at 66; Nurse's Evaluation, Plaintiffs' Exhibit 56. Tracy Easley is unable to communicate verbally. Lucille Easley at 66. She has some capacity to communicate with others through blinking eyes or facial expressions, which she exercises only with family or others she feels comfortable with. *Id.* at 67. The parties have stipulated that under the state's definitions, Tracy Easley is physically disabled, but not mentally alert. Parties' Exhibit 100.

In 1987, Tracy Easley, acting through her mother Lucille Easley, applied for and received attendant care services from Resources for Living Independently (RLI), the agency contracting with the DPW to serve consumers in the West Philadelphia area in which Ms. Easley then lived. Plaintiffs' Exhibit 51. When she began with RLI, Ms. Easley received nineteen hours of services, a total which gradually ascended to thirty-three hours as of the date February 25, 1991. Stipulations of Parties, Parties' Exhibits 100–01.

Included among the attendant care services that Tracy Easley received were various health maintenance activities such as suctioning mucus, total bowel care, and range of motion exercises. Lucille Easley at 78–80. These services are necessary for Tracy Easley's health and well-being. Plaintiffs' Direct Examination of Sheila MacMaster, Registered Nurse, Neighborhood Home Health Services, Tr. of Oct. 12 at 32–33.

In November, 1991 Ms. Easley moved out of the geographic area served by RLI. Lucille Easley at 73. Her new location was served by Homemaker Services of the Metropolitan Area. *Id.* Homemaker Services reevaluated her, and on November 7, 1991 determined that because she was not mentally alert, she was ineligible for attendant care services. Plaintiffs' Direct Examination of Fern Moskowitz, Vice President, Chief Operating Officer, Resources for Living Independently, Tr. of Oct. 13, at 15–16.

She instead now receives "homemaker services" from Homemaker Services. *Id.* at 16. She has received 15–20 hours of homemaker services since she stopped receiving attendant care services. Lucille Easley at 78–80, 81. In addition to the reduction in hours, the "homemaker" program does not provide the health maintenance services, such as suctioning, bowel care, and physical therapy, that the attendant care program does. *Id.* In other respects, "homemaker" services are equivalent to "attendant care" services. Direct Examination of Al Condeluci, Tr. of Oct 12 at 155.

### 2. Florence Howard

Florence Howard is a fifty-three year old woman, and mother of three adult children, suffering from multiple sclerosis and chronic undifferentiated schizophrenia. Plaintiffs' Direct Examination of Linda Howard, Daughter of Florence Howard, Tr. of Oct. 12 at 42, 44. She uses a wheelchair, but is mobile from the waist up. *Id.* at 42. She is able to feed herself. *Id.* She is able to communicate her needs to her daughter, and has some awareness of her hygiene and personal needs. *Id.* at 52, 55. However, the parties have stipulated that she is not "mentally alert" as defined by the Attendant Care statute. Parties' Exhibit 100.

Ms. Howard lived with her daughter, Linda Howard, until September 1991. Linda Howard at 40–41. During this time Linda Howard tried without success to secure attendant care services for her mother. *Id.* at 59. Linda Howard and her sister, who both work, eventually decided they could not care for their mother at home, and in September 1991 decided to place her in a nursing home. *Id.* Both Florence Howard and Linda Howard have expressed dissatisfaction with the care Florence Howard receives in the Philadelphia Nursing Home. *Id.* at 49–52.

The Howards would like to move Florence Howard out of the nursing home, perhaps into a group home in the community. *Id.* at 49, 56. In pursuit of that objective, Florence Howard applied to Homemaker Services of the Metropolitan Area on January 6, 1993 for attendant care services, without which she would be unable to live outside the institution. *Id.* at 49; Plaintiffs' Exhibit 35–B. The assessment of the application recognized that Ms. Howard needs some attendant care services, particularly health maintenance services. Attendant Care Assessment Summary, Plaintiffs' Exhibit 53–A. However, Homemaker Services determined that she was ineligible for attendant care because she was not mentally alert. *Id.*

### DISCUSSION

### I.

■ In July, 1990 Congress enacted the Americans with Disabilities Act. 42 U.S.C. §§ 12101–12213. Through this legislation, the federal government extended the non-discrimination principles required of institutions receiving federal funds by the Rehabilitation Act, 29 U.S.C. §§ 791–794, to a much wider array of institutions and businesses including services provided by states and municipalities. 42 U.S.C. §§ 12101–12213; *see also Galloway v. Superior Court of District of Columbia,* 816 F.Supp. 12, 20 (D.D.C. 1993). Because much of the language and legal principles of the ADA are modeled on the Rehabilitation Act, *see* 42 U.S.C. § 12133 (extending enforcement remedies and procedures of Rehabilitation Act to ADA), past interpretations of the Rehabilitation Act are persuasive authority for ADA interpretations. *Medical Society of New Jersey v. Jacobs,* 1993 WL 413016, *6 (D.N.J.1993) (also reported in 2 A.D. Cases 1318).

■ The ADA, like the Rehabilitation Act, must be read to give effect to its overarching mission of "protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to legitimate concerns ...". *School Board of Nassau County, Florida v. Arline,* 480 U.S. 273, 287, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987).

Title II of the Americans with Disabilities Act (Public Services) provides that

> no *qualified* individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. 12132 (emphasis added). The Attorney General of the United States was required to issue regulations implementing this anti-discrimination command. 42 U.S.C. 12134. These regulations are an important guide to the meaning of the statutory command. *Arline,* 480 U.S. at 279, 107 S.Ct. at 1127 (1987) (citing regulations to the Rehabilitation Act); *see also Alexander v. Choate,* 469 U.S. 287, 304, n. 24, 105 S.Ct. 712, 722, n. 24, 83 L.Ed.2d 661 (1985).

It is undisputed by the parties that the defendant is a public entity, and that the plaintiffs are physically disabled. Before me are the overlapping questions of whether the

plaintiffs are "qualified individuals" and if so whether they have been discriminated against by their exclusion from the Attendant Care program.

■ The implementing regulation which guides my determination as to who is a "qualified" individual is 28 CFR 35.130(b)(8) which provides:

A public entity shall not impose or apply *eligibility criteria* that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program or activity, unless such criteria can be shown to be *necessary for the provision of the service, program, or activity being offered.* (emphasis added).

This regulation modifies the general non-discrimination command, by specifying that in determining whether an individual is "qualified" to receive a service I must recognize only eligibility criteria that are "necessary for the provision of the service, program, or activity being offered." This regulation states explicitly what courts have read as implicit in the Rehabilitation Act—that in determining whether an individual is "qualified" for a service or benefit, I can not rest on the state's characterization of the service, nor on the qualifications or eligibility criteria that the state asserts as necessary, but instead must make an independent inquiry into the "essential nature" of the program. *Strathie v. Department of Transportation,* 716 F.2d 227, 231 (3d Cir.1983); *Pandazides v. Virginia Bd. of Educ.,* 946 F.2d 345, 349 (4th Cir.1991) ("The district court must look be-

hind the qualifications [for] [t]o do otherwise reduces the term 'otherwise qualified' and any arbitrary set of requirements to a tautology."); *see also Jacobs,* 1993 WL 413016 at *6.

■ In order to determine the "essential nature" of the program I must analyze and if necessary pierce the description of the program provided by the state, and determine what service is actually being offered. In determining what service is actually being offered, I must look at both the physical services provided *and* the benefits the state has targeted. For the state to defend its eligibility criterion as part of the essential nature of the program it must illustrate how that criterion facilitates—is "necessary"—to yield the benefits targeted by the state. In this case that means the state must show why the filtering criterion of "mental alertness" is necessary for the state to avoid providing the service to individuals incapable of experiencing the benefit.[1] If the filtering criterion is not necessary, then these physically disabled plaintiffs are qualified to receive the service despite their lack of mental alertness.

■ The state offers Attendant Care Services to the physically disabled so that they are able to: live in the least restrictive environment as independently as possible, remain in their homes and prevent their inappropriate institutionalization, and, seek and/or maintain employment. DPW Manual, Plaintiffs' Exhibit 1 at 1. Achievement of any of these benefits is independently sufficient justification for providing Attendant

---

1. In treating the term "mentally alert" as the filtering criterion at issue, I will treat the phrase as the state does—as defined solely by the capacity to hire, fire and supervise care providers and to manage one's own financial and legal affairs. Stipulation, Parties Exhibit 100. While the statute actually lists these capacities as criteria additional to mental alertness, rather than as the definition of mental alertness, the DPW has interpreted and applied the term mental alertness as equal to the above capacities, with no other filtering mechanisms. *Id.*

Therefore the eligibility criterion on which I am focusing is just the listed capacities. This criterion of course does not discriminate against the mentally disabled by name, and might in fact also discriminate against individuals who have no diagnosed mental disability, but whose physi-

cal disability render them unable to communicate. However, the fact that the screening criterion is not explicitly a disability does not alter my inquiry, if the effect is to deprive a class of disabled individuals of the service. *Alexander,* 469 U.S. 287, 105 S.Ct. 712 (recognizing disparate impact as bulwark of handicapped discrimination claims); *see also Coleman v. Zatechka,* 824 F.Supp. 1360, 1368–72 (D.Neb.1993) (addressing university's eligibility criteria for receiving a roommate, limits on use of room space and frequency of visitors, in regards to disabled student who wanted a roommate at her university). It is clear that the capabilities criterion used by the state burdens the mentally disabled, perhaps just as much as if the term "mentally alert" was given independent effect.

Care Services to a consumer. Plaintiffs' Direct Examination of Paula Jean Howley, DPW Attendant Care Program Manager, Trial Transcript of October 12, 1993 at 105.

The state is free to provide Attendant Care Services only to those individuals who can benefit in those three ways, and exclude disabled individuals who cannot. The ADA does not shackle the state to the extent that it must provide attendant care for all disabled individuals who can benefit *in any way* from the physical services provided. *Cf. Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) (exclusion of hearing impaired woman from nursing school not a violation of Rehabilitation Act, despite fact that she could benefit from education by learning some skills she could use, because her disability would interfere with achieving the goal for which the services were intended, the achievement of a nursing degree); *Knutzen v. Eben Ezer Lutheran Housing Center,* 617 F.Supp. 977, 982 (D.Col.1985) (the fact that certain services would "be useful" to any disabled individuals, did not mean that the Rehabilitation Act was violated by a program directing services to the needs of the elderly and physically handicapped.)

Instead, the state must have freedom to provide services directed at a certain goal. For example, if the state wanted to provide Attendant Care Services only so that physically disabled people could get to work, and not for the other two listed reasons it would be free to do so. The state could then properly exclude individuals unable to achieve that specifically targeted benefit.

Indeed, without this freedom to target physical services to certain goals, a regulation to the ADA would be stripped of meaning. Regulation 28 CFR § 35.130(c) provides that:

Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

It is this regulation that allows the state to provide attendant care services to the physically immobilized, but not to the hearing impaired or to the mentally retarded.[2]

■ If the state were required to provide any service directed towards disabled individuals to every disabled individual able to benefit from it in any way, it would be virtually impossible to provide services to one disabled group and not another. The instant case is a perfect example—there are almost no classes of disabilities whose members could not benefit from Attendant Care Services in some way, and therefore if my inquiry was limited to who could benefit from the physical services I would be required not just to eliminate the criterion of mental alertness, but the criterion of physical disability as well. This would render the affirmative opportunity created by 28 CFR § 35.130(c) virtually meaningless. Accordingly, it is clear that I must examine not just the physical service, but the benefits and goals at which those services are targeted, to decide whether the non-mentally alert are being properly excluded.[3]

---

2. The state reads this regulation to endorse even greater state latitude, freeing the state to discriminate *among the disabled group targeted*—here the physically disabled—on the basis of another disability. I do not find this characterization persuasive. *See* Section II of this opinion.

3. Of course, the stated benefit or goal must be one that rationally springs from the service, and not merely a subterfuge for allowing the same discrimination as the eligibility criterion. *Cf. Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985) ("The benefit itself, of course cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled."). For example, if the state in this case required the capacity to "hire,

fire, and supervise" as the eligibility criterion for Attendant Care Services in pursuit of the goal of providing handicapped individuals with the experience of aristocratic or royal behavior, I might be compelled to find a violation not because the criterion was inimicable with the services and goals, but because the services and stated goals had no rational relationship to each other. *Cf. Hodel v. Indiana,* 452 U.S. 314, 323–24, 101 S.Ct. 2376, 2382–83, 69 L.Ed.2d 40 (1981) (legislation does not meet rational basis test if there is no reasonable connection between the regulatory means selected and the asserted ends) (citations omitted); *see also Steffan v. Aspin,* 8 F.3d 57 (D.C.Cir.1993) (exclusion of homosexuals from military fails rational basis test).

All witnesses for both parties admitted or conceded in response to plaintiffs' examination that consumers who lacked the capacity to hire, fire, supervise, etc. could benefit from attendant care services. Plaintiffs' Direct Examination of Paula Jean Howley, Head of DPW Attendant Care Program, Trial Transcript of October 12, 1993 at 132–33; Plaintiffs' Direct Examination of Al Condeluci, Expert Witness, Executive Director of the United Cerebral Palsy Assoc. of the Pittsburgh District, Tr. of October 12 at 164–66; Plaintiffs' Cross Examination of Fern Moskowitz, Vice President, Chief Operating Officer of Resources for Living Independently, Tr. of October 13 at 25, 29, 30; Plaintiffs' Cross Examination of Joann Bush, Director of Nursing at Homemaker Service of the Metropolitan Area, Tr. of October 13 at 92–94; Plaintiffs' Cross Examination of Peggy Layton, Attendant Care Coordinator, Homemaker Service of the Metropolitan Area, Tr. of October 13 at 122–23.

The evidence further illustrates that non-mentally alert consumers could benefit from attendant care in the manner targeted by the state. The daily services provide "more independence" to recipients, regardless of their mental status. *See* Testimony of Al Condeluci, Executive Director of United Cerebral Palsy of Pittsburgh, Tr. of Oct. 12 at 156–157. Dr. Condeluci testified to the following:

> Attendants really serve basically as a set of arms and legs and in some cases, decision making supports for individuals in getting up for their day. An attendant will come in, in the morning, help prepare somebody for their day. That might mean getting the person out of bed into their chair or into whatever mobility device they may be using. An opportunity to make sure the individual is clean and comfortable. Dressed to the extent that they care to be dressed, to—depending on the day and what they have planned for the day. Will provide direct supports around feeding, getting breakfast up and rolling. Getting the person to eat. Will help in the preparation around planning for the day....

*Id.* No witnesses contested the fact that the plaintiffs could benefit in the manner testified to by Mr. Condeluci. Nor did any witnesses suggest that the state or DPW required any greater benefit or any greater achievement of independence from service recipients who were mentally alert.

Furthermore, the plaintiffs bear witness to, and the state did not rebut, that the availability of attendant care facilitates the second goal, the opportunity to avoid institutionalization. Ms. Howard seeks attendant care services in order to leave a nursing home and enter a group home. Testimony of Linda Howard, daughter of plaintiff Florence Howard, Tr. of October 12 at 43, 49, 56. Tracy Easley is not in an institution, but the absence of attendant care services places a tremendous burden on her family. Testimony of Lucille Easley, mother of plaintiff Tracy Easley, Tr. of October 12 at 81, 84. While there was no testimony indicating that Tracy Easley would go to an institution if this action were decided in favor of the state, it is obvious that the added increment of duties placed on the family by the removal of attendant care services could force the Easleys to institutionalize the plaintiff, Tracy Easley.

The evidence thus clearly indicates that the availability of attendant care services provides a very tangible increase in independence—the opportunity to remain in a community or family home rather than an institution—to those not deemed "mentally alert." It is this level of independence that has been trumpeted as the first priority of the Attendant Care program, DPW Attendant Care Manual, Plaintiffs' Exhibit 1 at 24, and as a linchpin of the American with Disabilities Act. 136 Cong.Rec. H11467 (daily ed. May 22, 1990) (statement of Rep. Dellums) ("a severe, lifelong disability may be handicapping, but more handicapping has been the practice of congregating services for persons with disabilities in settings different or separate from those in which [others] are provided those services").

Despite finding that physically disabled, non-mentally alert individuals can benefit from the service in the same manner intended and expected for those who are mentally alert, I would still uphold the eligibility criterion if the state showed that its criterion was "necessary for the provision of the services"

from the standpoint of the state's capacity to serve.

The state would have had to argue and prove that, given the structure of its program, it cannot serve the mentally disabled. For example, if the attendant care services were provided by robots instead of people, and the robots could only be programmed by the consumer, then a requirement of mental alertness would be appropriate because the agency could not feasibly provide the necessary supervision. To be less absurd, the state might contend that in order to serve non-mentally alert consumers, it would have to provide a level of training that it was incapable of providing, or the caregivers insufficiently educated to take advantage of.

The state, however, put forward no evidence that indicates to me that the caregivers' ability to serve the consumers was compromised by the consumers' inability to direct them, and in fact witnesses testified that the basic services would be the same regardless of the consumer role.[4] Plaintiffs' Direct Examination of Fern Moskowitz, Tr. of Oct. 13 at 26; Plaintiffs' Direct Examination of Al Condeluci, Tr. of Oct. 12 at 173.

The state attempts to justify the eligibility criterion by pointing to a much lauded aspect of the program, consumer control. Defendant's Direct Examination of Paula Jean Howley, Tr. of Oct. 13 at 138–40. However, nowhere in the program description, or in the practice of the program, is there evidence that consumer control is anything more than an opportunity for service recipients. As stated in the introduction to the Attendant Care Manual "[a] major innovation of the Program is that consumers have *the right* to direct their own service; ie., screening, interviewing, hiring, training, managing, paying and firing attendants." Attendant Care Manual, Plaintiff's Exhibit 1, page 1 (emphasis added). The state has in no way proved that the above listed attributes are necessary for the services to be provided, or for the benefits to be received.[5] At most, the right to exercise consumer control is another independently sufficient benefit of the program, to be included among the three already listed, but not an essential benefit of the program that consumers must be "qualified" to

4. Even if the state had proved that the attendant care service required in-home supervision it would be obliged to accommodate—make "reasonable modifications" for—the mentally disabled, if an accommodation could be made without "fundamentally altering" the program. 28 CFR § 35.130(b)7.

At trial, the plaintiffs provided expert testimony that consumers could and did employ surrogates, such as Tracy Easley's mother, to help manage attendant caregivers. Plaintiffs' Direct Examination of Al Condeluci, Tr. of Oct. 12 at 175–76; Plaintiffs' Direct Examination of Fern Moskowitz, Tr. of Oct. 13 at 25. While the state challenged the authority of agencies to allow the practice of employing surrogates under the current structure of the Act, Defendants' Direct Examination of Paula Jean Howley, Tr. of Oct. 13 at 142–43, it never rebutted why, in practical terms, the state could not amend the act to allow this accommodation to replace the need for the consumer to be able to hire, fire and supervise. *Cf. Jackson v. Fort Stanton Hospital and Training School*, 757 F.Supp. 1243, 1299 (D.N.M.1990), rev'd in part, 964 F.2d 980 (10th Cir.1992) ("Where reasonable accommodations in community programs can be made, defendants' failure to integrate severely handicapped residents into community programs that presently serve less severely handicapped residents violates [the Rehabilitation Act].") I find that the use of surro-

gates would be a reasonable accommodation to the Attendant Care Program, and that the experience of caregivers and consumers reveals that it would not "fundamentally alter" the program.

5. The argument that mentally disabled individuals cannot benefit from an attendant care program which incorporates elements of consumer control is undercut by a federal grant program, amended to the Rehabilitation Act in 1992, which promotes services identical to the Pennsylvania Act in every respect save the filtering criterion of "mental alertness." *See* 29 U.S.C.A. 796 (1993).

The statute asserts as its purpose the promotion of "independent living, including a *philosophy of consumer control.*" *Id.* (emphasis added). The services which the federal government will fund include health maintenance and attendant care. 34 CFR 365.37. The state receiving funds, however, cannot exclude individuals from a service solely on the basis of disability. 34 CFR 365.31. Included among "basic conditions" which the state may implement the program in conformity with is that *"eligibility is based only upon* ... [t]he presence of a severe physical or *mental disability* ... [and] the presence of a severe limitation in ability to function independently in family or community." *Id.* (emphasis added).

receive.[6]

Indeed, mentally alert individuals are fully empowered to relinquish consumer control by selecting the agency model. Plaintiffs' Direct Examination of Paula Jean Howley, Tr. of October 12 at 125. Thus the opportunity for consumer control, which undergirds the state's contention that this program benefits mentally alert individuals in a way that it cannot help those who are not, is in fact not a necessary component of the program for the mentally alert. Nor, as the state's witness concedes, does the use of attendant care services by individuals who are incapable of using the consumer model in any way diminish the ability or opportunity of consumers who desire complete control to have it. Plaintiffs' Cross Examination of Paula Jean Howley, Tr. of October 13 at 150–51.

The state seems only to be asserting that there is a quantum of independence which consumers must achieve for the services to be worthwhile—a quantum of independence which is delineated only by the capacity of mentally alert individuals to enjoy it. *See* Plaintiff's Direct Examination of Paula Jean Howley, Trial Transcript of October 12, 1993 at 106 (Response to the question whether some physically disabled persons would be eligible for attendant care services who may not be fully independent: "No, they are independent. If you're mentally alert and you're living where you want to live and making your own decisions, you are independent.").

In this case I must guard against, and must be sure that the state guards against, the "thoughtlessness and indifference" and the "shameful oversights" that so often characterize treatment of the disabled. *Alexander v. Choate*, 469 U.S. 287, 295, 105 S.Ct. 712, 717, 83 L.Ed.2d 661 (1985). Acting without invidious motives, the state in this instance may be guilty of excluding the mentally disabled from its vision of community.[7] Legislators and administrators may find their imagination insufficiently broad to comprehend the "more independence" that a mentally handicapped person can achieve by avoiding institutionalization. *Cf.* Timothy M. Cook, *The Americans with Disabilities Act: The Move to Integration,* 64 Temp.L.Rev. 393, 400–01 (1991) (cataloguing this country's history of segregating disabled individuals, particularly the "feeble-minded"). It is exactly this type of "benign neglect", *Choate,* 469 U.S. at 295, 105 S.Ct. at 717, that the Rehabilitation Act and ADA target, and that must be excised from the Attendant Care statute. The term "mentally alert", defined by the criterion of being able to hire, fire, supervise and manage financial and legal affairs, is an unnecessary qualification for receipt of the benefits sought for physically disabled individuals from the Attendant Care Program. Because this criterion was used to exclude Tracy Easley and Florence Howard they have been discriminated against in violation of ADA Regulation 28 CFR § 130(b)(8).

## II.

Defendants also argue that even if the Attendant Care program discriminates against the mentally disabled, such discrimination is allowed under regulation 28 CFR § 35.130(c). That regulation provides that:

Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities *beyond those required by this part.* (emphasis added).

Defendants read this section to authorize any discrimination, no matter how arbitrary,

---

**6.** It is in fact unlikely that I would uphold the statute as drafted if the opportunity to exercise complete consumer control was the only benefit sought after by the state. The logical correlation between the service and the benefit might be so tenuous as to defy rationality. *See* footnote 3 of this opinion. In other words, if the "hire, fire, supervise" eligibility criteria for Attendant Care services were contended as necessary because the benefit sought was the opportunity to "hire, fire, supervise", the eligibility criterion would of course correspond with the benefit sought, but

the physical services provided would be so attenuated from the benefit that it might well be invalidated under a rational basis test.

**7.** Plaintiffs were indeed insistent on acknowledging that the state had no invidious intent. They took pains to point out that this legislation was passed and implemented in 1987 before the ADA was in effect, and was therefore perfectly legal at the time. Plaintiffs' Opening Statement, Trial Transcript at 4–5.

when the state is providing an affirmative service for the handicapped. They assert that the Americans with Disabilities Act was designed to end improper differentiation between disabled and non-disabled persons, but that it was not meant to serve as a limit on affirmative steps the state takes to benefit disabled persons.

The defendants' contention captures part of the spirit of the Act, but mischaracterizes how that spirit should be manifested in this area. Defendants are correct that the state may provide a service to some handicapped individuals, and not others. For example, the state may provide hearing aids to the hearing impaired; clearly they need not also provide hearing aids to quadriplegics who are not hearing impaired. Nor must the state provide one disabled group with the roughly functional equivalent of the service that they provided another group, ie. if quadriplegics receive wheelchairs, the blind are not necessarily entitled to seeing eye dogs.

However, the issue before me is quite different. The plaintiffs are not arguing that since the physically disabled receive attendant care services, the mentally disabled must also receive those services. Instead, the plaintiffs here *are* physically disabled individuals. They simply happen to fall into a subset of the physically disabled who are also mentally disabled. They are not demanding the service on the basis of their mental disability, but their physical disability. The discrimination at its root is between handicapped and non-handicapped persons,—the mentally disabled and non-mentally disabled—which is exactly what the defendant agrees is the gravamen of the Act.

The defendants would certainly never contend that an affirmative program for the physically handicapped could arbitrarily exclude otherwise eligible individuals because of their race, religion or gender. But they argue that an exclusionary term grounded in disability, no matter what relation that term has with the attributes of the program, can be used. Such a reading would completely undercut the non-discrimination principle of the Act. Indeed, regulation 130(c) modifies the discretion granted the state by the words, "beyond those required by this part." The natural reading of these words in relation to the entire section is that the state has freedom to provide programs to the handicapped to the limit of the non-discrimination principles included in·the rest of the Act.

The defendant cites in opposition to this understanding *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), in which the Supreme Court upheld against a Rehabilitation Act challenge a Veterans Administration policy that extended educational assistance benefits to all veterans who could not take advantage timely because of disability, but excluded disabled veterans whose disability was the result of "willful misconduct." The court cited a regulation of the Rehabilitation Act that is analogous to the one relied upon defendants here, providing that " 'exclusions of a specific class of handicapped persons from a program limited by Federal statute or executive order to a different class of handicapped persons' is not prohibited." *Id.* at 549, 108 S.Ct. at 1382 (citing 45 CFR § 84.4(c) (1986)).

The defendants read *Traynor* for a broader principle then it in fact maintains.[8] The discriminating term in that case, "willful misconduct," refers neither to a certain disability, nor to characteristics of a certain disability. The government is not trying or having the effect of depriving a benefit because of an invidious or stereotypical notion regarding disabled persons. Instead the determination of eligibility for a benefit turns on a completely different threshold issue, that of misconduct, an action rather than a condition or symptom of a disability. Because the discriminating term does not refer to a disability, explicitly or implicitly, it does not violate the Rehabilitation Act. *See Jackson v. Fort Stanton Hospital·and Training School,* 757 F.Supp. 1243, 1298 n. 36 (D.N.M.1990), rev'd in part, 964 F.2d 980 (10th Cir.1990) (distin-

---

**8.** The *Traynor* holding may in fact be *sui generis* in that it was grounded largely in the principle that the Court would not read an implied repeal of one Congressional statute, the "GI Bill," into the terms of a later statute, the Rehabilitation Act. *Id.* 485 U.S. at 551–52, 108 S.Ct. at 1383–84. That circumstance does not exist here, since the ADA is being used to challenge a state statute.

guishing *Traynor* because of the difference between criteria which are symptoms of a handicap, and those which are the causes of a handicap).

In the action before me the defendants are discriminating either specifically against mental disabilities, or in a more generous characterization, against a symptom of mental disabilities, the inability to hire, fire, supervise, etc. This specifically violates the anti-discrimination principle by treating mentally disabled persons worse than non-mentally disabled.

## CONCLUSION

I find that the plaintiffs, Tracy Easley and Florence Howard, have been discriminated against in violation of Title II of the Americans with Disabilities Act, and its implementing regulation 28 CFR § 130(b)(8). I also find that regulation 28 CFR § 130(c), which allows states to establish affirmative programs for selected disabled groups, does not authorize discrimination among a selected group on the basis of another disability. Relief to the plaintiffs will be accorded as specified in my accompanying order.

AND NOW, this 20th day of December, 1993, IT IS ORDERED THAT:

1. Defendant Department of Public Welfare and providers of attendant care services that contract with the Department are enjoined from excluding the named plaintiffs, Tracy Easley and Florence Howard, from attendant care services because they are not mentally alert, cannot hire, fire, and supervise an attendant, or cannot manage their own financial and legal affairs.

2. Plaintiffs Tracy Easley and Florence Howard are to be reevaluated for Attendant Care Services pursuant to the state guidelines as modified by this ORDER.