James **NEIBERGER**, Danford Eldridge, Paul Gardner, Terence Jacobs, Bradley Glennie, David Snyders, Lawrence Eubank and Allen Hall, Plaintiffs,

v.

Robert **HAWKINS**, individually and in his official capacity as Superintendent of the Colorado Mental Health Institute at Pueblo; Garry Toerber, individually and in his official capacity as Associate Manager for the Office of Direct Services of the Department of Human Services; Colorado Department of Human Services; and Colorado Mental Health Institute at Pueblo, Defendants.

No. CIV.A. 99B1120MJW.

United States District Court,
D. Colorado.

Dec. 13, 2002.

James E. Hartley, Steven W. Black, Stephanie B. Edinger, Holland & Hart, LLP, Thomas F. Quinn, Solomon, Pearl, Blum, Neymann & Stich, LLP, Denver, CO, Sylvia V. Kirk, Sylvia V. Kirk, Attorney at Law, Englewood, CO, Kathleen Mullen, David H. Miller, King & Greisen, LLP, Denver, CO, Gary M. Clexton, Miller & Steiert, P.C., Littletown, CO, Thomas Baker Quinn, White & Steele, P.C., Denver, CO, for Plaintiffs.

Cathy H. Greer, Pamela Leggett Skelton, Wells, Anderson & Race LLC, Christine M. Arguello, Linda S. Comer, Attorney General's Office, David R. DeMuro, Vaughan & DeMuro, Mickey T. Mihm, Ronald H. Nemirow, Kennedy & Christopher, P.C., Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Plaintiffs, patients of the Forensic Institute at the Colorado Mental Health Institute at Pueblo ("CMHI-P"), bring three surviving claims: (1) violation of Colorado's Care and Treatment of the Mentally Ill Act; (2) violation of Due Process pursuant to 42 U.S.C. § 1983; and (3) violation of § 504 of the Rehabilitation Act. The Plaintiffs originally brought those claims against Defendants Robert Hawkins (individually and in his official capacity as Superintendent of the CMHI-P), Garry Toerber (individually and in his official capacity as Associate Manager for the Office of Direct Services of the Department of Human Services), Colorado Department of Human Services, and CMHI-P. Mr. Hawkins and Dr. Toerber ("individual Defendants") move individually for summary judgment. The Colorado Department of Human Services and CMHI-P ("State Defendants") move for summary judgment as well. The motions are adequately briefed and oral argument was held on December 5, 2002. For the reasons set forth below, I grant Mr. Hawkins' motion for summary judgment, grant Dr. Toerber's motion for summary judgment, and grant in part and deny in part the State Defendants' motion for summary judgment.

### I. Facts

The facts of this case are set out in *Neiberger v. Hawkins,* 70 F.Supp.2d 1177 (D.Colo.1999), *aff'd,* 6 Fed.Appx. 683, 2001 WL 227405 (10th Cir.2001), and need not be fully repeated here. This action was brought by patients of the Forensic Institute at the CMHI-P who were placed there pursuant to criminal adjudications of not guilty by reason of insanity. Plaintiffs allege a combination of hostile conditions and policies that prevent them from obtaining appropriate medical and psychiatric care. The original Plaintiffs in the case were James Neiberger, Danford Eldridge, Paul Gardner, and Terence Jacobs.

In a May 22, 2002 Order, I granted the Plaintiffs' motion to certify this case as a class action. I certified the Plaintiffs' class as all adult patients who are now or in the future will be involuntarily committed to the Institute of Forensic Psychiatry ("IFP") of the Colorado Mental Health Institute at Pueblo due to an adjudication of not guilty by reason of insanity. In that same Order, I also considered numerous challenges to the Plaintiffs' *third amended complaint.* The following claims survived:

(1) Claim one: violation of Colorado's Care and Treatment of the Mentally Ill Act:

 (a) by named Plaintiffs against all Defendants, except Dr. Toerber, for injunctive and declaratory relief, with no entitlement to damages; and

 (b) by class Plaintiffs against all Defendants, except Dr. Toerber, for injunctive and declaratory relief, with no entitlement to damages.

(2) Claim three: violation of the Due Process clause of the United States Constitution pursuant to 42 U.S.C. § 1983:

 (a) by named Plaintiffs against all Defendants, except Dr. Toerber, for declaratory and injunctive relief;

 (b) by named Plaintiffs against Mr. Hawkins for damages in his individual capacity and for prospective injunctive relief in his official capacity;

 (c) by named Plaintiffs against Dr. Toerber for damages in his individual capacity incurred prior to February 28, 2001; and

 (d) by class Plaintiffs against all Defendants, except Dr. Toerber, for declaratory and injunctive relief only.

(3) Claim four: violation of § 504 of the Rehabilitation Act:

(a) by named Plaintiffs against all Defendants, except Dr. Toerber, in their official capacities for declaratory and injunctive relief only; and

(b) by class Plaintiffs against all Defendants, except Dr. Toerber, in their official capacities for declaratory and injunctive relief only.

I next considered a motion by Plaintiffs to substitute defendants and amend their *third amended complaint.* In their motion to substitute defendants, the Plaintiffs sought to replace Robert Hawkins in his individual and official capacities. Mr. Hawkins, who has died while this suit is pending, was replaced by Steven Schoenmakers as Acting Superintendent of CMHI–P. A suggestion of Mr. Hawkins' death was filed with this Court on August 2, 2002. Plaintiffs also sought to replace Garry Toerber in his official capacity. In their motion to amend, Plaintiffs noted that Ms. Elizabeth Stillman replaced Dr. Toerber as Director of the State Psychiatric Hospitals "in or about March 2001." I granted the Plaintiffs' motion with respect to the replacement of Mr. Hawkins in his individual and official capacities (the Estate of Robert Hawkins replaced Mr. Hawkins as to the § 1983 individual capacity claim) and denied the motion with respect to the replacement of Dr. Toerber. I denied the Plaintiffs' motion to amend.

Pursuant to the Plaintiffs' subsequent motion for reconsideration or clarification, I clarified my May 22, 2002 Order to note that the Plaintiffs' official capacity claims against Dr. Toerber's former Office—the Office of Director of Hospital Services—remain viable for declaratory and injunctive relief only. I now consider the individual Defendants' and State Defendants' motions for summary judgment.

## II. Summary Judgment Standard

The purpose of a summary judgment motion is to assess whether trial is necessary. *See White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). Rule 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mares v. ConAgra Poultry Co.,* 971 F.2d 492, 494 (10th Cir. 1992).

Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. Fed. R.Civ.P. 56(e); *see also Otteson v. United States,* 622 F.2d 516, 519 (10th Cir.1980). These facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

## III. The Scope of the Plaintiffs' Constitutional Rights

The individual Defendants move for summary judgment on the named Plaintiffs' substantive due process claim. I begin by defining the scope of the duty they owed to these plaintiffs.

### A. Substantive Due Process

The Fourteenth Amendment of the United States Constitution explicitly guarantees to each citizen that no state shall "deprive any person of life, liberty, or property, without due process of law...."

U.S. Const. amend. XIV, § 1. The clause guarantees the right of appropriate procedural process (not implicated in this case) before a state can act to deprive an individual of his or her life, liberty, or property. *See, e.g., Sanders v. Bd. of County Comm'rs,* 192 F.Supp.2d 1094, 1106 (D.Colo.2001). The Fourteenth Amendment also contains a judicially recognized substantive due process component that protects an individual's life, liberty and property against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

■ Violation of substantive due process rights pursuant to the Fourteenth Amendment of the U.S. Constitution is remedied through 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. This section provides a means for redress of violations of the rights protected under the Fourteenth Amendment by state actors. *Sanders,* 192 F.Supp.2d at 1106.

*B. The Constitutional Duty in the Present Case*

■ The Fourteenth Amendment serves "as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Patten v. Nichols,* 274 F.3d 829, 837 (4th Cir.2001). Thus, the clause confers no "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney,* 489 U.S. at 196, 109 S.Ct. 998.

■ However, certain exceptions apply. The Eighth Amendment obligates the state to provide medical care to incarcerated prisoners, *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and the Fourteenth Amendment obligates the state to provide certain services to involuntarily committed psychiatric patients. *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *see Patten,* 274 F.3d at 837. These two cases together,

stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general wellbeing. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs ... it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause... In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means. *DeShaney,* 489 U.S. at 199–200, 109 S.Ct. 998 (internal citations omitted).

■ Plaintiffs are involuntarily committed patients at the Institution of Forensic

Psychiatry of the Colorado Mental Health Institute at Pueblo. As such, they are owed an affirmative duty of care under the *DeShaney* exception.

■ *Youngberg*, which *DeShaney* cites, defines the protection involuntarily committed patients enjoy as "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Youngberg*, 457 U.S. at 324, 102 S.Ct. 2452; *Jackson v. Fort Stanton Hosp. & Training Sch.*, 964 F.2d 980, 991 (10th Cir.1992). Named Plaintiffs assert, and Defendants do not dispute, that *Youngberg* applies to this case. They are entitled to these interests.

*C. The Appropriate Level of Culpability*

■ The Fourteenth Amendment's substantive due process component only protects citizens from arbitrary, abusive, or oppressive use of governmental power. *Daniels*, 474 U.S. at 332, 106 S.Ct. 662. That conduct must be so egregious that it "shocks the conscience" of the court. *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir.1995). Conscience-shocking behavior is most likely to be found where there is an intent to do harm that is not justified by any governmental interest. *Lewis*, 523 U.S. at 846, 118 S.Ct. 1708. Negligence, as the "lowest common denominator of customary tort liability," is "categorically beneath the threshold of constitutional due process." *Id.* at 848–49, 118 S.Ct. 1708. The "middle range" of culpability in between those extremes, "following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Id.* at 849, 118 S.Ct. 1708 (internal citation and quotation omitted).

Within this middle range, *Lewis* directs the inquiry to the official's opportunity for deliberation. *See id.* at 850–55, 118 S.Ct. 1708 (citing, *inter alia*, *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); and *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

When evaluating a "shock of conscience," I must also consider three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: 1) the need for restraint in defining their scope; *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); 2) the concern that § 1983 not replace state tort law; *DeShaney* 489 U.S. at 202, 109 S.Ct. 998; and 3) the need for deference to local policymaking bodies in making decisions impacting upon public safety. *Collins*, 503 U.S. at 128–29, 112 S.Ct. 1061; *see also Uhlrig*, 64 F.3d at 573.

*D. The Standard of Care*

■ The named Plaintiffs contend that the appropriate standard is that of "deliberate indifference," while the individual Defendants assert the "professional judgment" standard adopted in *Youngberg*. I agree with the individual Defendants.

■ The "deliberate indifference" standard is the appropriate measure of a prison official's conduct in cases alleging cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir.1990). But the Plaintiffs have not been committed for punishment. *See, e.g., People v. Chavez*, 629 P.2d 1040, 1048 (Colo.1981). Moreover, the Plaintiffs assert their substantive due process rights under *Youngberg* itself and

*Youngberg* squarely rejected the deliberate indifference standard. *Youngberg,* 457 U.S. at 312 n. 11, 102 S.Ct. 2452.

██ As noted in *Shaw,* the *Youngberg* court "was clearly of the view that the mentally retarded—whose involuntary institutionalization, although sometimes unavoidable, is in no way a product of their own fault—merit greater constitutional vigilance from their caretakers than do ordinary prisoners." *Shaw,* 920 F.2d at 1144–45. But the Court was wary "of placing too onerous a burden on these officials." *Id.* at 1145. For that reason, the *Youngberg* Court adopted the "professional judgment" standard as "a middleground between the 'deliberate indifference' standard applicable to prison officials and the 'compelling' and 'substantial' necessity tests that had been embraced by a majority of this court." *Id.* (citing *Youngberg,* 457 U.S. at 321–22, 102 S.Ct. 2452) (internal citations omitted). While the deliberate indifference standard requires a showing that the state actor was recklessly indifferent, grossly negligent, or deliberately or intentionally indifferent, the professional judgment standard requires only that a plaintiff show a decision that is "a substantial departure from accepted professional judgment, practice, or standards." *Id.* (quoting *Youngberg,* 457 U.S. at 314, 102 S.Ct. 2452).

██ "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.' " *Youngberg,* 457 U.S. at 320, 102 S.Ct. 2452 (citing *Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961)). Accordingly, whether one's constitutional rights have been violated "must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 321. Such determination "cannot be left to

the unguided discretion of a judge or jury." *Id.*

██ That is because there "is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Id.* at 323, 102 S.Ct. 2452. "[C]ourts must show deference to the judgment exercised by a qualified professional." *Id.* at 322, 102 S.Ct. 2452.

> For those reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment. *Id; see also Jackson,* 964 F.2d at 991.

*Youngberg* recognized the necessity of a presumption of correctness due professionals in mental institutions—often overcrowded and understaffed—to function outside a "shadow of an action for damages." *Youngberg,* 457 U.S. at 324–25, 102 S.Ct. 2452. Under *Youngberg,* this standard applies to all decisions made by a professional. *Id.* at 322, 102 S.Ct. 2452. The Court defined "professional decisionmaker" as,

> a person competent, whether by education, training or experience, to make the particular decision at issue. Longterm treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the su-

pervision of qualified persons. *Id.* at 324 n. 30, 102 S.Ct. 2452.

Named Plaintiffs allege a combination of constitutionally deficient systemic conditions and policies that prevent them from obtaining appropriate medical and psychiatric care. Defendant Robert Hawkins was the Superintendent of the CMHI–P. Plaintiffs allege that he was responsible for ensuring that the CMHI–P provide care and treatment consistent with statutory (not implicated in the § 1983 claim) and constitutional standards. Defendant Garry Toerber was the Associate Manager of the Office of Direct Services of the Department of Human Services and Director of the Pueblo state psychiatric hospital. As Director, Dr. Toerber is alleged to have been responsible for overseeing all aspects of the operations and, thus, for ensuring that patients at the CMHI–P receive proper medical and psychiatric treatment. *Neiberger v. Hawkins*, 70 F.Supp.2d 1177, 1180 (D.Colo.1999). The named Plaintiffs' substantive due process claim against the individual Defendants, which seeks to hold the individual Defendants liable in damages for constitutionally deficient conditions and policies of the CMHI–P is, therefore, *reliant* on the premise that the individual Defendants are able to control the conditions of the CMHI–P. Those with that amount of responsibility, by necessity, require the "appropriate training" and a "person competent … to make the particular decision at-issue." *Id.*

In sum, I conclude that the professional judgment standard applies to the individual Defendants' conduct. *See Shaw*, 920 F.2d at 1147 (applying the professional judgment standard to a mental institution's superintendent, assistant superintendent, program coordinator, unit manager, recreation director, occupational therapist, and other professionals, but applying the deliberate indifference standard to non-

professional residential service aides); *see also Patten*, 274 F.3d at 838.

Because that standard applies to the individual Defendants' conduct, *Youngberg's* full protection applies. In addition to its presumption of correct professional judgment, *Youngberg* noted that "[i]n an action for damages against a professional in his individual capacity … the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability." 457 U.S. at 323, 102 S.Ct. 2452.

## IV. The Individual Defendants' Motions for Summary Judgment

Dr. Toerber and Mr. Hawkins both argue qualified immunity and assert their lack of involvement and control in the CMHI–P conditions. Before considering those arguments, however, I first consider whether under the summary judgment record the individual Defendants have shocked the conscience of the Court and whether their conduct is protected from liability by the professional judgment standard. I consider Dr. Toerber's and Mr. Hawkins' motions together because they are similar, and grant their motions on multiple bases.

### A. Whether the Individual Defendants "Shocked the Conscience" of this Court

*Uhlrig* dictates that in a "shock of conscience" analysis I must consider three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: 1) the need for restraint in defining their scope; *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); 2) the concern that § 1983 not replace state tort law; *DeShaney*, 489 U.S. at 202, 109 S.Ct. 998; and 3) the need for deference to

local policymaking bodies in making decisions impacting upon public safety. *Collins*, 503 U.S. at 128–29, 112 S.Ct. 1061; *Uhlrig*, 64 F.3d at 573. If the Defendants' actions are within the "middle range" of culpability, I must also consider the official's opportunity for deliberation. *Lewis*, 523 U.S. at 850–55, 118 S.Ct. 1708.

### 1. Scope of the Claim

The named Plaintiffs base their claims on *Youngberg*. In *Youngberg*, the Supreme Court considered the substantive due process rights of involuntarily committed individuals in a state institution for the mentally retarded. *Youngberg*, 457 U.S. at 309, 102 S.Ct. 2452. The plaintiff, Nicholas Romeo, was a 33 year-old man with the mental capacity of an 18–month–old child. *Id.* at 309, 102 S.Ct. 2452. At the institution, Romeo was allegedly injured at least sixty-three times "both by his own violence and by the reactions of other residents to him." *Id.* at 310, 102 S.Ct. 2452. Romeo's complaint alleged that the institution's officials knew, or should have known, that Romeo was suffering injuries and the officials failed to institute appropriate preventive procedures, thus violating his Eighth and Fourteenth Amendment rights. *Id.*

Romeo asserted a right to safe conditions, freedom from bodily restraint, and "a constitutional right to minimally adequate habilitation," *id.* at 316, 102 S.Ct. 2452, defined by the Supreme Court as the "training and development of needed skills." *Id.* at 317, 102 S.Ct. 2452. The Court interpreted Romeo's claim to assert "only training related to safety and freedom from restraints," *id.* at 318, 102 S.Ct. 2452, and noted that Romeo had dropped his assertion of a right to "such treatment as will afford them a reasonable opportunity to acquire and maintain those life skills necessary to cope as effectively as their capacities permit." *Id.* at 318 n. 23, 102 S.Ct. 2452. Ultimately, though Romeo's asserted right to habilitation was "more troubling" than his other asserted rights, *id.* at 316, 102 S.Ct. 2452, the Supreme Court found that Romeo had a substantive due process right to the training he asserted: that related to reasonable safety and care, and freedom from undue restraint. *Id.* at 319, 102 S.Ct. 2452.

■ The named Plaintiffs have alleged systemic deficiencies giving rise to substandard care and treatment, routine lockups, placement in overcrowded and dangerous wards, understaffing, and commitment in excess of typical time frames for similar committees in other institutions. They contend that had the CMHI–P conditions and treatment been adequate, they would by now have been rehabilitated and the state would have released them. Because the *Youngberg* Court provided no right with respect to release, however, the named Plaintiffs' claim, at least to that extent, exceeds the scope of *Youngberg*.

Under *Uhlrig*, I must consider the *Collins* principle and use restraint in defining the scope of the named Plaintiffs' rights. The first *Uhlrig* principle therefore works in favor of the individual Defendants' motion for summary judgment.

### 2. The Concern that § 1983 Not Replace Tort Law

■ *Uhlrig's* second consideration requires concern for the principle that Section 1983 not replace state tort law. Here, the named Plaintiffs have proffered evidence to suggest that the individual Defendants knew of the overcrowding, understaffing, and insufficient care at the CMHI–P. Evidence suggests the individual Defendants may have known of assaults and been aware of the institution's above-average time for retaining committees. Ultimately, because their claims are premised upon an evidenced known risk, and because the allegations are dependent

upon decisions that require deliberation, *see Lewis,* 523 U.S. at 853, 118 S.Ct. 1708, the named Plaintiffs' claims do not appear to merely replace state tort law. This principle weighs against the individual Defendants' motion for summary judgment.

### 3. The Need for Deference

*Uhlrig's* third principle dictates that I consider the need for deference by local policymaking bodies in making decisions that affect public safety. *Uhlrig,* 64 F.3d at 573. The named Plaintiffs argue that they have been subjected to unconstitutional confinement conditions because of the policy decisions of the individual Defendants. As noted above, I must grant deference to those decisions, not only under *Uhlrig's* third principle, but presumptively under *Youngberg* as well. I also bear in mind that their decisions were made in light of state legislative and budgetary constraints.

The named Plaintiffs contend that the individual Defendants—knowing of the deficient conditions, understaffing, and overcrowding—did nothing more than reject suggestions to improve the conditions or assign those suggestions for further study. As noted by Mr. Hawkins, those decisions—particularly those regarding release of the Plaintiffs—were decisions that directly affected public safety. While indicating a possible lack of solution, it is undisputed that Mr. Hawkins and Dr. Toerber made policy decisions. There is no genuine issue of material fact that Mr. Hawkins and Dr. Toerber professionally decided to reject or assign any recommendation for further study. This principle therefore favors the individual Defendants.

With those three factors in mind—even in light of *Lewis'* "deliberation" analysis—I conclude that the individual Defendants' actions fail to shock the conscience of this Court. Though the disputed facts at issue may show something greater than a mere

tort, the individual Defendants' conduct can not "properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis,* 523 U.S. at 847, 118 S.Ct. 1708 (quoting *Collins,* 503 U.S. at 128, 112 S.Ct. 1061).

Summary judgment to the individual Defendants is therefore appropriate on this basis.

### B. Whether the Individual Defendants Exercised Professional Judgment

*Youngberg* requires that "courts must show deference to the judgment exercised by a qualified professional." 457 U.S. at 322, 102 S.Ct. 2452.

> For those reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment. *Id; see also Jackson,* 964 F.2d at 991.

The named Plaintiffs argue that summary judgment is inappropriate because material issues of fact remain whether the hospital could have been operated constitutionally. Even assuming unconstitutional conditions that could have been alleviated by the individual Defendants the professional judgment standard—absent evidence in rebuttal—requires only that the professional, without substantial departure, exercise judgment. *Youngberg,* 457 U.S. at 322, 102 S.Ct. 2452. Again, the named Plaintiffs proffer evidence of instances in which the individual Defendants were presented with suggestions to improve CMHI–P's conditions. Instead of implementing those suggestions, they contend, the individual Defendants rejected them or assigned them for further study. Either modality, particularly in response

to conflicting suggestions, shows the very exercise of professional judgment to which *Youngberg* grants deference. The named Plaintiffs have presented no genuine issue of material fact to show a lack of or substantial departure from this judgment. The presumption is therefore not rebutted, and summary judgment is appropriate on this basis as well.

### C. Qualified Immunity

 Qualified immunity shields government officials from liability when they perform discretionary functions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 516 (10th Cir.1998). "The key to the qualified immunity inquiry is the objective reasonableness of the official's conduct in light of the legal rules that were clearly established at the time the action was taken." *Id.* (internal citations and quotations omitted). A two part test determines whether qualified immunity is implicated:

> First, we determine whether the plaintiff has sufficiently alleged that the defendant violated a statutory or constitutional right. If the answer is yes, then we determine whether the right was clearly established such that a reasonable person in the defendant's position would have known that his or her conduct violated that right.

*Id.* (internal citations omitted).

 The contours of that defense change slightly in summary judgment analysis:

> When a § 1983 defendant raises the defense of qualified immunity on summary judgment, [in place of showing sufficient Constitutional allegations, the plaintiff] must come forward with sufficient facts to show the official violated that clearly established law. The defendant bears the normal summary judgment burden

of showing no material facts that would defeat the qualified immunity defense remain in dispute. *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir.2002).

### 1. Sufficient Facts to Show the Officials Violated a Statutory or Constitutional Right

*Youngberg* provides "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." 457 U.S. at 324, 102 S.Ct. 2452.

 The named Plaintiffs provide evidence that Dr. Toerber and Mr. Hawkins were aware of overcrowding and other systemic deficiencies at the CMHI–P. They have proffered expert opinions to show "glaring and protracted deficiencies" and "systemic indifference" to the treatment needs of patients. But, as stated before, the named Plaintiffs contend that the individual Defendants' actions were not adequate in response to those conditions. As I noted above, that proffered evidence entitles the individual Defendants to a presumption that the they exercised their professional judgment. Moreover, under the law and circumstances of this case, the individual Defendants' conduct has not shocked this Court's conscience. With regard to Mr. Hawkins, the Plaintiffs have not proffered evidence showing that he had power to alleviate the allegedly unconstitutional conditions (see Section D below). The named Plaintiffs have, therefore, not evidenced constitutional violations by either individual Defendant.

### 2. Clearly Established Law

 Early in the case, the individual Defendants first raised their qualified immunity defense in motions to dismiss. In *Neiberger v. Hawkins,* 70 F.Supp.2d 1177, 1190–91 (D.Colo.1999), I considered their

challenge in a Rule 12 context and concluded that, "Plaintiffs allege Due Process violations of a type known by a reasonable person in the health care administration field." *Neiberger I*, 70 F.Supp.2d at 1191. The Tenth Circuit upheld that decision in *Neiberger v. Hawkins*, 6 Fed.Appx. 683, 686, 2001 WL 227405, *2 (10th Cir.2001). I now consider that defense in the context of their summary judgment motions.

In *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court clarified what constitutes clearly established law. The *Anderson* Court noted,

> [t]he operation of this standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. *Id.* at 639, 107 S.Ct. 3034 (internal citations omitted).

Thus,

> our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of the pre-existing law the

unlawfulness must be apparent. *Id.* at 640, 107 S.Ct. 3034.

*Youngberg's* clearly established rights include "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Youngberg*, 457 U.S. at 324, 102 S.Ct. 2452. *Youngberg* left undecided whether a committee has a right to reasonable treatment to help that patient return to freedom. *Id.* at 318 n. 23, 102 S.Ct. 2452 (noting that respondents no longer asserted that state officials owed a *per se* right to "such treatment as will afford them a reasonable opportunity to acquire and maintain those life skills necessary to cope as effectively as their capacities permit").

The named Plaintiffs' claim is premised in part upon a similar assertion—that had their care been better, they would have been released sooner because they would be sufficiently treated by now. In *Youngberg*, the plaintiff contested being shackled and asserted that he was inadequately protected from his own violent outbursts and those of others reacting to him. *Id.* at 310–11, 102 S.Ct. 2452. The Court held that the plaintiff had a substantive due process right to training, but *only* to the extent it would assist in alleviating the plaintiff's rights to reasonable care and safety and reasonably nonrestrictive confinement conditions. *Id.* at 319, 102 S.Ct. 2452. No comparable training is at-issue here.

The named Plaintiffs' other substantive due process allegations assert more general violations of their rights to reasonable care, treatment, and safety stemming from systemic deficiencies. Unlike *Youngberg*, however, they do not allege a continual pattern of easily identifiable abuses. While *Youngberg* considered a failure to protect the plaintiff from sixty-three al-

leged physical altercations, *id.* at 310, 102 S.Ct. 2452, the named Plaintiffs allege the individual Defendants' failure in policies and conditions resulting in nothing more specific than generalized unconstitutional conditions and prolonged confinement. I therefore conclude, based on the summary judgment record before me, that reasonable officials in the individual Defendants' positions would not have understood that they were violating the named Plaintiffs' constitutional rights. In light of the pre-existing law, the unlawfulness of their action was not apparent. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

Accordingly, qualified immunity provides another basis upon which I grant the individual Defendants' motions for summary judgment.

### D. *"Lack of Control" Arguments by the Individual Defendants*

 Both individual Defendants correctly note that liability under § 1983 cannot be imposed vicariously or under traditional grounds of respondeat superior. *Shaw,* 920 F.2d at 1147; *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Rather, only those defendants whose conduct personally caused plaintiffs' injuries may be held liable. *Shaw,* 920 F.2d at 1147. "[L]iability may only be imposed on those defendants who had the power and the responsibility to protect [the Plaintiffs] but who failed to do so." *Id.* In order to survive summary judgment, a plaintiff "need only raise a genuine issue of material fact regarding the causal connection between an individual defendant's actions [or inaction] and [the plaintiff's] injury." *Id.* at 1148.

The individual Defendants contend that they lacked an affirmative role and had no personal participation in the alleged conditions at the CMHI–P. I consider their arguments in the context of *Youngberg* and *Shaw* and look to whether the named

Plaintiffs have evidence showing that the individual Defendants had the power or responsibility to alleviate offending CMHI–P conditions. If there is no genuine issue of material fact showing the individual Defendants' ability to affect CMHI–P conditions, the named Plaintiffs' case would lack a causal connection between their conduct and the possible improvement of conditions at the CMHI–P. Stated differently, the individual Defendants contend that because they had no power or responsibility over CMHI–P conditions, their conduct did not cause the CMHI–P conditions to continue.

#### a) *Mr. Hawkins*

 Mr. Hawkins contends that he did not participate in "direct patient care" and was not involved in the grievance process. He provides evidence that he could not control the discharge of a patient, but only recommend such discharge. In response (arguing the deliberate indifference standard), the named Plaintiffs argue that material questions of fact remain as to the individual Defendants' "deliberate indifference" because the Colorado General Assembly mandated minimum levels of care for committees and because the evidence indicates that both individual Defendants did little or nothing to address the named Plaintiffs' concerns. The named Plaintiffs do not, however, provide evidence of how those general mandates gave Mr. Hawkins the power and responsibility to make the CMHI–P compliant with the law. They therefore show no genuine issue of material fact that Mr. Hawkins' alleged conduct *caused* the failure to alleviate the conditions.

#### b) *Dr. Toerber*

 In a similar vein, Dr. Toerber contends that the Colorado state courts decide when to commit and release individuals

adjudicated not guilty by reason of insanity. He asserts that he was not involved in decisions that affected the named Plaintiffs and did not cause long-term problems that the state courts and General Assembly policy decisions created. As with Mr. Hawkins, Dr. Toerber's arguments point to an alleged deficiency of evidence connecting Dr. Toerber to the power and responsibility to alleviate the alleged conditions at the CMHI–P.

In response to Dr. Toerber's argument the named Plaintiffs cite to evidence of Dr. Toerber's job description. The first of those documents, actually submitted by Dr. Toerber, reads, "[a]ll aspects of the statewide mental health delivery system are impacted by decisions made by [Dr. Toerber's] position as well as all programs, services, and personnel. In addition, mentally ill persons requiring inpatient services could be affected by this position's decision making." Toerber Exh. A–2, Mgmt. Job Evaluation Questionnaire at 6. Dr. Toerber's next exhibit states that in his position he is "required to see that all legal and ethical responsibilities as specified by the appropriate statutes, ordinances, laws, or governmental rules and regulations pertaining to the two hospitals are complied with." Toeber Exh. A–3, Expedited Mgmt. Job Evaluation Questionnaire at 3. Both documents are signed by Dr. Toerber.

This evidence raises a genuine issue of material fact with respect to Dr. Toerber's power and responsibility to alleviate the alleged conditions of the CMHI–P. Therefore, a genuine issue of material fact remains as to whether Dr. Toerber's alleged conduct caused the alleged failure to rectify conditions at CMHI–P. Summary judgment would not be appropriate on this basis as to Dr. Toerber.

## V. The State Defendants' Motion for Summary Judgment

The State Defendants move for summary judgment against the named Plaintiffs' due process, Treatment Act, and Rehabilitation Act claims. I grant their motion only with respect to the Plaintiffs' Rehabilitation Act claim.

### A. The Plaintiffs' Due Process Claims

 First, the State Defendants move for summary judgment on the Plaintiffs' claims of substantive due process. They rely on *Woe v. Cuomo*, 729 F.2d 96 (2d Cir.1984), and contend that the State Defendants' Joint Commission on Accreditation of Hospitals ("JCAH") accreditation constitutes *prima facie* evidence of constitutionally adequate conditions. On the summary judgment record before me, I disagree.

In *Woe*, the Second Circuit considered the constitutional adequacy of treatment provided to persons civilly committed to New York State mental institutions. *Woe*, 729 F.2d at 97. The Plaintiffs offered five standards by which the constitutionality of care may be gauged: "(1) JCAH non-accreditation, (2) [Department of Health and Human Services] non-certification, (3) reports of scandalous care by the media, other professionals, etc., (4) the level of care provided by general hospital inpatient psychiatric facilities, and (5) commitment to the lower tier of the alleged 'two-tier' system of mental health care." *Id.* at 104. The Court found that only standards (1) and (2) show evidence of noncompliance with the *Youngberg* standard. *Id.* at 106.

Specifically, the *Woe* Court held that "JCAH approval represents an 'exercise of professional judgment' to which we must defer under *Youngberg*." *Id.* at 106. The court reasoned, "This is true not solely because ... JCAH is a highly respected organization of psychiatric and medical

professionals, and the value of its accreditation program has been recognized by Congress and the courts." *Id.* It also has merit because "many of the JCAH criteria *bear directly on the likelihood that professional judgments will govern individual treatment decisions within the institution.*" *Id.* (emphasis added). It explained,

> JCAH standards address the existence, quality and specificity of patient treatment plans. They require clear procedures for the use of drugs and other therapies, including written approval by a physician. They examine the availability of medical care in all respects, and the manner in which it is provided. *The JCAH process thus seeks to assure that the facility itself is structured so that decisions will be professionally made. Id.* (emphasis added).

The Second Circuit concluded that JCAH accreditation was *prima facie* evidence of an exercise of professional judgment. It premised that ruling on undisputed factual findings: those showing the JCAH process seeking to assure professionally made decisions. Those factual findings—made in 1984 and repeated by the Fourth Circuit 1990, *see Thomas S. v. Flaherty,* 902 F.2d 250, 253 (4th Cir. 1990)—may or may not be true today.

The State Defendants, unlike the *Woe* Defendants, have not submitted evidence to show that JCAH accreditation evidences an exercise of *present* professional judgment. I therefore conclude that the State Defendants have not established a *prima facie* showing of an institutional exercise of professional judgment through their JCAH accreditation and, thus, genuine issues of material fact remain whether these Defendants have the benefit of any *prima facie* evidence of an exercise of professional judgment.

*B. The Plaintiffs' Claims Under Colorado's Care and Treatment of the Mentally Ill Act*

Next, the State Defendants move for summary judgment of the Plaintiffs' claims under Colorado's Care and Treatment of the Mentally Ill Act ("Treatment Act"). They contend that the Treatment Act does not apply to patients committed as NGRI and ask that I reconsider my ruling that "the Treatment Act and its general standards of care apply to persons adjudicated and committed as NGRI." *Neiberger v. Hawkins,* 70 F.Supp.2d 1177, 1186 (D.Colo.1999) ("*Neiberger I*"). In the alternative, the State Defendants ask that I clarify my holding to specify which of the Treatment Act's non-treatment provisions apply to criminally insane committees. I decline both invitations.

First, the State Defendants move for summary judgment, asking that I reconsider my ruling in *Neiberger I.* The State Defendants contend that Colo.Rev.Stat. § 27–10–125(1)(a) "clearly provides that a person who is 'insane, as defined in section 16–8–101, C.R.S., . . . is not then subject to proceedings under this article . . . .'" Motion for Summary Judgment of State Defendants at 10 (quoting Colo.Rev.Stat. § 16–8–101). Yet, in the body of their argument, State Defendants cited only the portions of the statute italicized below. The full provision reads:

> When any interested person wishes to obtain a determination as to the imposition of a legal disability or the deprivation of a legal right for any person who is mentally ill and a danger to himself or others, is gravely disabled, or is *insane, as defined in section 16–8–101, C.R.S., and who is not then subject to proceedings under this article* or part 3 or part 4 of article 14 of title 15, C.R.S., such interested person may petition the court for a specific finding as to such disability or deprivation of a legal right. Actions

commenced pursuant to this subsection (1) may include but shall not be limited to actions to determine contractual rights and rights with regard to the operation of motor vehicles. Colo.Rev. Stat. § 27–10–125(1)(a) (emphasis added).

The State Defendants ignore the clause "and who," thereby changing the provision's intent to fit their argument. The section's plain meaning provides that an interested person may initiate a court proceeding when, *inter alia,* (1) the subject is "insane, as defined in section 16–8–101, C.R.S." *and* (2) the person "is not then subject to proceedings under this article .…" Colo.Rev.Stat. § 27–10–125(1)(a). As Plaintiffs correctly note, the statute presupposes that an NGRI adjudicated patient *could be* subject to provisions under the article. And as State Defendants correctly note, the statute also presupposes that *not every* NGRI patient is subject to the article. In its entirety, Colo.Rev.Stat. § 27–10–125(1)(a) does not support their argument. I decline to reconsider my holding in *Neiberger I. See Neiberger I,* 70 F.Supp.2d at 1186.

State Defendants alternatively ask that I clarify my holding to determine which, if any, of the Treatment Act's non-treatment provisions apply to criminally insane committees. Though they mention some conflicting law in passing, the State Defendants decline to argue the Plaintiffs' specific claims or allegations. The issue of which, if any, of the Treatment Act's non-treatment provisions apply to criminally insane committees is, therefore, not properly postured for consideration in this summary judgment motion. I decline to consider that question at this time.

*C. The Plaintiffs' Claims Under the Rehabilitation Act*

 Finally, the State Defendants move for summary judgment on the Plaintiffs' Rehabilitation Act claims. They argue that the Plaintiffs fail to meet the four-part test outlined in *Johnson by Johnson v. Thompson,* 971 F.2d 1487, 1492 (10th Cir.1992). I agree.

Section 504 of the Rehabilitation Act of 1973 provides that:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance .… 29 U.S.C. § 794; *Welsh v. City of Tulsa,* 977 F.2d 1415, 1417 (10th Cir.1992).

 To state a claim under section 504, a plaintiff must allege "(1) that he is a 'handicapped individual' under the Act, (2) that he is 'otherwise qualified' for the [benefit] sought, (3) that he was [discriminated against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." *Johnson by Johnson v. Thompson,* 971 F.2d 1487, 1492 (10th Cir.1992) (citations omitted); *Pahulu v. Univ. of Kan.,* 897 F.Supp. 1387 (D.Kan.1995).

The State Defendants contend that the Plaintiffs are not "handicapped individuals" under the Rehabilitation Act. I agree. The Rehabilitation Act covers each "qualified individual with a disability in the United States, as defined in section 705(20)." 29 U.S.C. § 794. Section 705(20)(B) states,

Subject to subparagraphs (C), (D), (E), and (F), the term 'individual with a disability' means, for purposes of [subchapter] V [29 U.S.C.A. § 790 et seq.] … any person who(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an

impairment; or (iii) is regarded as having such an impairment. 29 U.S.C. § 705(20)(B).

Colo.Rev.Stat. § 16–8–101 and § 16–8–101.5 provide the definition of insanity for the purpose of NGRI findings. Both state, "A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable." Colo. Rev.Stat. § 16–8–101(1); Colo.Rev.Stat. § 16–8–101.5(a). Colo.Rev.Stat. § 16–8–101.5(b) also covers people "who suffered from a condition of mind caused by mental disease or defect that prevented the person from forming a culpable mental state that is an essential element of a crime charged ...." Colo.Rev.Stat. § 16–8–101.5(a)–(b).

Hence, the Rehabilitation Act protects persons who suffer from, *inter alia*, mental impairment which substantially limits one or more of such person's major life activities while the Colorado Revised Statutes allow a plea of NGRI for those who were "so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong ...." Colo.Rev.Stat. § 16–8–101(1); Colo.Rev.Stat. § 16–8–101.5(a).

■ First, the Plaintiffs have proffered no evidence to show that they suffer from mental impairment. Insanity is a legal concept, not a medical diagnosis. *See, e.g., Parrish v. Colorado*, 78 F.3d 1473, 1477 (10th Cir.1996). Second, the adjudication of NGRI establishes only that the Plaintiffs could not distinguish right from wrong *at the time they committed their respective acts* for which they are committed. Nothing shows any such present defect. And third, the Plaintiffs have not shown how an incapacity of distinguishing right from wrong limits their major life activities.

In sum, I conclude that the Plaintiffs have not proffered sufficient evidence to show that they are individuals with a disability within the meaning of the Rehabilitation Act. I therefore grant the State Defendants' motion for summary judgment with respect to the Plaintiffs' claims under the Rehabilitation Act.

Accordingly, IT IS ORDERED that:

(1) Mr. Hawkins' motion for summary judgment is GRANTED;

(2) Dr. Toerber's motion for summary judgment is GRANTED;

(3) The State Defendants' motion for summary judgment is GRANTED with respect to the Plaintiffs' claim under the Rehabilitation Act and DENIED with respect to the Plaintiffs' substantive due process claims and the Plaintiffs' claims under the Treatment Act; and

(4) The following claims remain:

(a) Claim one: violation of Colorado's Care and Treatment of the Mentally Ill Act:

i) by named Plaintiffs and class Plaintiffs against Defendants Colorado Department of Human Services, Colorado Mental Health Institute at Pueblo, Steven Schoenmakers (in his official capacity only) as Acting Superintendent of CMHI–P, and the Office of Director of Hospital Services; all for injunctive and declaratory relief, with no entitlement to damages; and

(b) Claim three: violation of the Due Process clause of the United States Constitution pursuant to 42 U.S.C. § 1983:

i) by named Plaintiffs and class Plaintiffs against Defendants Colorado Department of Human Services, Colorado Mental Health Institute at Pueblo, Steven Schoenmakers (in his official capacity only) as Acting Superintendent of CMHI–P, and the Office of Director of Hospital Services; all for

injunctive and declaratory relief, with no entitlement to damages.